Larry WILLIAMS, Plaintiff-Appellee,

v.

BOARD OF REGENTS OF THE UNI-
VERSITY SYSTEM OF GEORGIA,
et al., Defendants,

Edward T. Kassinger, etc., et al.,
Defendants-Appellants.

No. 77–2305.

United States Court of Appeals,
Fifth Circuit.

June 5, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 6, 1980.

Arthur K. Bolton, Atty. Gen., Robert S. Stubbs, II, Executive Asst. Atty. Gen., Don A. Langham, First Asst. Atty. Gen., Alfred L. Evans, Jr., Sr. Asst. Atty. Gen., Atlanta, Ga., for defendants-appellants.

J. Hue Henry, Andrew H. Marshall, Athens, Ga., for plaintiff-appellee.

Before THORNBERRY, CHARLES CLARK and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge.

After a jury trial in this 42 U.S.C. § 1983 action, the appellee was awarded damages for being wrongfully discharged for engaging in a protected First Amendment activity. The appellant charges numerous errors essentially comprehended by the ruling of the district court that evidence tending to establish a confidentiality policy towards police accident reports was inadmissible. We affirm the district court.

Because the case turns on complex facts, a rather lengthy review is required. At all times relevant to this appeal appellee Larry Williams was a lieutenant in the University of Georgia Police force. Appellant Saye was the chief of the university force and was appellee's ultimate, as contrasted with immediate, superior. Appellant Kassinger was the director of the university's Division of Public Safety, and as such, Chief Saye's superior.

Williams alleged that two distinct factual situations figured in his discharge: his intention to offer as candidate for Sheriff of Clarke County and his actions in connection with a motor vehicle accident involving a prominent police official. Although the jury held that the discharge was the result of the latter, both dovetail factually.

In early May of 1976, Larry Williams informed appellant Saye that he wished to run for the office of Sheriff. Because of the overlap in jurisdiction of the various law enforcement agencies in Athens and because each university officer is a sworn deputy sheriff, the appellants apparently determined that Williams' candidacy was not in the best interest of the department. Chief Saye offered Williams two alternatives to resignation: a leave of absence without pay or a voluntary reduction in rank. Appellee refused both suggestions. When it was discovered by appellants that University of Georgia policy encouraged rather than discouraged political activity, appellants' overt resistance to Lt. Williams' plans was discontinued. The basis for appellants' fears that Williams' candidacy would not benefit the smooth interworking of the different law enforcement agencies in Athens was because it was not known whether the incumbent would seek re-election and because of a rumor that Winfred Tate Brown, Chief of the Athens police force, would be a candidate.

The scene abruptly shifts to a rainy intersection on the evening of May 14, 1976. University of Georgia Officers Harris and Brewer were dispatched to investigate an automobile accident involving two vehicles. The driver at fault was Chief Winfred Tate Brown. The occupants of the other vehicle told Brewer that in their opinion Brown was under the influence of alcohol. Brewer duly talked to Brown and noted that his breath smelled of alcohol and that he was staggering. It must be noted that Brown had received a minor head wound in the accident. Brewer determined it would be prudent to have Brown's breath analyzed at the hospital after he had been medically treated. Meanwhile, Brown apparently radioed his office for an Athens force patrolman to assist him. Although it was a breach of procedure for one agency to interfere with another, Brewer permitted the Athens patrolman to transport Brown to the hospital. Brown never arrived at the designated hospital, having ordered the patrolman to take him to his personal physician instead. Brown, therefore, was not administered a breath test.

As fate would have it, appellee was the duty officer on the 14th of May. When Brewer returned, before preparing an accident report, he discussed the accident with

Williams, as is customary in unusual cases, including his observations and the disappearance of Brown. Appellee instructed Brewer to make his accident report as he saw fit. Accordingly, Brewer recorded the accident and its aftermath exactly as it occurred. Specifically, in the area of the standard accident report form dealing with the sobriety [1] of the subject at fault Brewer checked the box labeled "Drinking, not known if impaired," consistent with his observations and the absence of confirmation by a breath or blood analysis.[2] The space for insurance carrier was left blank because Brewer was unable to question the absent Brown. At the bottom of the page in the space reserved for comments, Brewer wrote, "See Supplementals" in reference to a supplemental report in which he objectively detailed the observations of the other participants in the accident, his own observations, the interference of the Athens police and the subsequent disappearance of Brown.[3] Brewer then referred the report to appellee who signed and passed it along the administrative channel to appellant Saye. Williams had already contacted Saye regarding the accident, and Saye had instructed him to place the report on his desk in such a way that other police personnel could not read it.

The next morning Chief Brown appeared at the office of appellant Saye in an effort to explain the accident. Brown admitted having had a couple of drinks but denied that he was under the influence.

After Brown departed, appellant Saye requested Officer Brewer to make several changes in the report. Initially, Brewer resisted but he was finally prevailed upon to make the suggested modifications. Specifically, three changes were made. The response in the sobriety section was changed to "Not known if drinking," the space for insurance coverage was filled in with the appropriate company, and in the space designated "Comments" the "See Supplementals" notation was replaced by a brief, sanitary description of the accident.[4] No changes were made in the supplemental report prepared by Brewer. Appellee was not advised of the alterations even though he had authorized and signed the original report.

■ Troubled by this occurrence, on the following day Brewer informed appellee of the changes made on the report. To confirm what had happened, Williams contacted the other party involved in the accident and discovered that she had indeed been given a copy of the modified report without the supplemental narrative. As a result appellee wrote a letter to both Saye and Kassinger [5] protesting the alteration. This

1. The report in question is the uniform accident report styled DPS form 523. The sobriety section contains six boxes labeled: (1) Not Drinking, (2) Drinking, Not Impaired, (3) Drinking, Not Known If Impaired, (4) Under Influence Alcohol/Drugs, (5) Not Known If Drinking, (6) blank.

2. This practice is also consistent with the teachings of the Uniform Motor Vehicle Accident Report Instruction Manual.

3. See n. 4 *infra*.

4. The method by which these changes were effected is noteworthy. Rather than crossing out the "erroneous" items and initialing the changes, the "errors" were first "whited out" and then the report rewritten without any evidence of the change remaining. The changes were not initialed. Indeed, because the "whiteout" obscured one of the boxes in the sobriety section, the box was *re-drawn* to further disguise the truth. The effect of this method was

the appearance that no changes were ever made. Moreover, by writing a brief description in the comments section and deleting Brewer's "See Supplementals" notation, the supplemental report was effectively buried.

5. The letter read as follows:

Dear Director Kassinger,

This letter is in regard to an automobile accident involving Winfred Brown and Cindy Bray, University Police Report #76-1987. It has come to my attention through a combination of circumstances that report #76-1987 has been deliberately altered. As stated in M.V.A. report 76-1987, this accident occurred on May 14, 1976, at approximately 11:45 p. m. As shift commander during this time period, as you know, I am responsible for the thorough, complete and accurate investigation of all criminal activities, traffic accidents, as well as various University of Georgia special details. I therefore have a strong and legitimate interest in this report

letter, dated May 24, 1976, was not mailed but rather both copies were hand-delivered to appellant Saye. There is a dispute as to appellee's intention with regard to the letter addressed to appellant Kassinger. According to appellant Saye, Williams stated that it was unnecessary to transmit the letter to Kassinger. In contrast, appellee claimed that he requested that Saye forward the letter. Appellee took no further steps in pursuing his grievance internally.[6]

On May 26, 1976 a local newspaper reporter notified appellant Saye that he possessed information concerning discrepancies in police reports involving the Brown accident. The reporter showed appellant Saye both copies of the accident report with the changes circled. Additionally, the reporter had appellee's protest letter of May 24. According to Saye, the reporter was convinced a cover-up had occurred.

After the meeting with the reporter, appellant Saye telephoned appellant Kassinger and reported what had occurred. Kas-

singer replied that a meeting should be held with the appellee that evening when he reported for duty. Despite Williams' request to be relieved of duty for the day due to an accident, he was ordered to report. Williams arrived with his father and after some disagreement whether his father should be permitted to remain, the meeting began. The problem with the reporter was first discussed: appellee denied that he had divulged the report. When asked if he knew who had, Lt. Williams replied that he could "speculate" as to the identity of the person but did not know. At this point Williams' father admitted that he had given the reporter copies of the report and letter. By way of explanation, Williams stated that in the course of obtaining advice from his father he had given his father copies of the reports and of his protest letter.

Tempers flared. Chief Saye pounded his desk and threatened to sue the father "in every court in the land." He also warned "I'll whip your ass" and became physically

---

compiled by an officer on my shift as well as the fact that this report was approved and signed by me certifying to its completeness and accuracy.

I therefore officially request that I be allowed to obtain copies of the original report and the altered report. If you saw the original report, as I did, you will note that there was inexcusable interference by County Police personnel with Patrolman Brewer's investigation and handling of the accident situation and that all parties involved reported that Winfred Brown was intoxicated. If this portion was cut out or altered, I feel we have a very serious situation which quite conceivably could be labeled as (a) participation in an insurance fraud, i. e., a false and/or incomplete report submitted for insurance purposes, (b) a University Police Department cover-up of offenses by Winfred Brown and other County Police officers, or (c) privileged treatment accorded to Mr. Brown by Chief Saye.

I feel I must do my job as Lieutenant as precisely and honestly as humanly possible. I cannot and will not in any way become involved in suppression of evidence whether it be through alteration or through omission of facts.

If the original report is not substituted for the altered report, I would like to officially request a letter from you absolving me of all responsibility for this accident report in its present altered form.

Sincerely,
Larry Williams
Lieutenant, UGPD
cc: Chief Charles D. Saye

**6.** As one of their citations of error the appellants contend the court erred in refusing their offer of evidence tending to establish the existence of an internal administrative grievance procedure. Appellants apparently argue that had another more appropriate forum existed as an alternative to going public, the grievance procedure should have been exhausted first. In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the court alluded to whether an employee should be compelled to exhaust a complaint internally. In a footnote the court stated:

There is likewise no occasion furnished by this case for consideration of the extent to which teachers can be required by narrowly drawn grievance procedures to submit complaints about the operation of the schools to their superiors for action thereon prior to bringing the complaints before the public. 391 U.S. at 572 n. 4, 88 S.Ct. at 1737. We need not consider here the extent to which an employee must exhaust internal procedures. Given the nature of the grievance and its cold reception by the department's ultimate superiors, it was unnecessary for the appellee to exhaust because such exhaustion would have been futile.

menacing, causing another officer to intervene. Kassinger fired the appellee and instructed him to turn in his equipment. On May 27 Kassinger confirmed the dismissal and informed Williams of the cause, referring to the "leak" of the report. Specifically, the letter of confirmation [7] read:

> Your immediate termination was deemed necessary because your continued service would jeopardize the security and confidentiality of the records and operations of the University of Georgia Police Department.

In the local newspaper front page headlines announced Williams' dismissal, and the accompanying story quoted appellant Saye that Williams' dissemination of the report was politically motivated. The appellee's campaign ground to a temporary halt.

The appellee immediately [8] filed this § 1983 action alleging that he was discharged for his political activity [9] and because he had engaged in protected first amendment activity. He was reinstated to his previous position by means of preliminary injunction,. the trial court having anticipated that appellee would prevail on his First Amendment claim. After a jury trial, appellee was awarded one cent in nominal damages, $16,000 in compensatory damages and $20,000 in punitive damages against Kassinger and one cent in nominal, $4,750 in compensatory and $8,000 in punitive damages against Saye.

The appellants cite numerous errors in the course of the proceeding below: *inter alia*, that the court erred in refusing to admit evidence offered to establish the ex-

---

7. In its entirety, the letter stated:

Dear Mr. Williams:

As a consequence of the receipt of information by Chief of Police David Saye on the evening of May 26, 1976, Chief Saye, Assistant Chief David Morris and I met in Chief Saye's office for the purpose of affording you a hearing relative to the unauthorized dissemination of a confidential investigative report to a noncriminal justice agency. We met at 11:00 PM at which time you were scheduled to be on duty as Shift Lieutenant. When you did not appear as scheduled, Chief David Saye told you telephonically at your home that it was necessary that we meet with you. You appeared at approximately 11:30 PM with your father whom you identified as your counsel.

You were thereafter advised that a reporter for the Athens Observer had contacted Chief David Saye at about 6:00 PM that evening. He showed Chief Saye and Assistant Chief Morris a copy of an investigative report which he indicated he got from you together with charges by you that the report had been altered in a "cover-up" of information which had been carried out by Chief Saye. Chief Saye asked you if you had done this. You replied you did not personally give it to the reporter Pete McCommons. You stated you had an idea who did it but it was only rumor and you were not in a position to identify that person. At that point your father volunteered that he gave it to Pete McCommons after getting it from you and that he had made the allegations concerning Chief Saye. At that point the meeting was concluded as I advised you your service with the University of Georgia Police Department was being terminated.

Your immediate termination was deemed necessary because your continued service would jeopardize the security and confidentiality of the records and operations of the University of Georgia Police Department. You have jeopardized the participation of the University of Georgia Police Department in essential law enforcement service to the community by such unauthorized actions.

Your termination is effective at the close of the 11:00 PM, 5/26/76 -7:00 AM, 5/27/76 shift for which you were scheduled for duty. You will be paid for accrued leave. You will be expected to return promptly all items and materials which are the property of the University of Georgia Police Department.

I wish to advise you that you have the right to appeal the foregoing action in accordance with the grievance procedure outlined on page 13 of the Classified Personnel Handbook. Should you desire to pursue the avenue of appeal you will do so through contact of the Director of Personnel Services of the University of Georgia who can further advise you in this regard.

8. The appellants have not argued that appellee should have exhausted his right to appeal his discharge internally as referenced in the letter printed at n. 7. Such administrative exhaustion is not a prerequisite to this § 1983 action. *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

9. Although appellants note that there is no constitutional right to run for state office protected by the Fourteenth Amendment, *Snowden v. Hughes*, 321 U.S. 1, 6-7, 64 S.Ct. 397, 400, 88 L.Ed. 497 (1944), the appellants do not press this legal result as grounds for reversal.

istence of a confidentiality policy with respect to police reports, in instructing the jury that the report was not confidential, in refusing to permit appellants to present a defense based upon confidentiality, in instructing the jury as to the law involving employees' first amendment rights, in disallowing the appellants to present so-called *Pickering* defenses, in refusing to charge the jury on a "good-faith" immunity defense, in failing to award a directed verdict and in refusing to order a new trial based on the excessiveness of damages.

Most of the appellants' grievances devolve directly from the decision of the district court that evidence tending to establish the existence of a confidentiality policy with respect to the police reports was inadmissible.[10] This decision was made only after an extensive preliminary evidentiary hearing. Appellants first contend that the court exceeded its powers and usurped the jury's in holding that no confidentiality policy existed: that is, because whether a policy exists is a fact, and fact-finding is reserved to the jury, the court erred in resolving the matter itself. For the purpose of analysis, this question can be bifurcated into: (1) the propriety of determining the question of admissibility by means of a preliminary hearing and (2) the validity of the court's determination that the proffered evidence was inadmissible.

To be admissible evidence must be relevant, and the resolution of the question of relevance is in the province of the presiding judge. Relevant evidence is defined in Fed.R.Evidence § 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Preliminarily, the court must determine which evidence is legally relevant, and hearings as to admissibility may be conducted out of the presence of the jury if justice requires. Fed.R.Evidence § 401. With respect to the instant question, the relevance of evidence tending to prove the existence of a departmental confidentiality policy, the operative language of the definition of relevance is "of *consequence* to the determination" : it must be shown that the evidence to be offered has a legal connec-

---

**10.** This decision of the district court forms the basis of the following appellants' citations of error:

1. The district court erred in: (a) excluding evidence showing that the University of Georgia Police Department maintains a policy of confidentiality in connection with the investigative reports of its police officers, and that Lt. Williams, at the time of his initial employment, had expressly agreed in writing not to reveal anything of a confidential or private nature made known to him in his official capacity, and (b) in making its own factual determination to the contrary, instructing the jury that there was nothing confidential about the report.

2. By disallowing Chief Saye and Director Kassinger to present defenses based upon the confidentiality of police investigative reports, both generally and as applied to the particular report involved in this case, the district court deprived these defendants of "fair trial" rights which are guaranteed to them by the Fifth and Seventh Amendments to the United States Constitution.
 (a) Chief Saye and Director Kassinger were deprived of the right to present an absolute defense that the "action" of Lt. Williams of divulging the contents of a confidential police report is not protected speech within the meaning of the First Amendment?
 (b) Chief Saye and Director Kassinger were also deprived of the right to present an "official immunity" defense based upon a good faith reliance upon an existing departmental policy of confidentiality as to its police reports.

 . . . . .

7. The district court erred in charging the jury that:
 (a) the investigative report in question in this case is "public information;" there was nothing confidential about the report when prepared; Lt. Williams had a constitutional right "to tell the world" about the same without interference by his superior officers, Chief Saye and Director Kassinger (Tr. 411 412, 415, 425);
 (b) that should the jury find that Lt. Williams "was fired" by either or both of the defendants (*i. e.* Chief Saye and Director Kassinger) because of his public disclosure of either the original or the final investigative report in question, it would be entitled to find against that defendant (or defendants) (Tr. 416–417, 426).

tion to the action. Here, the evidence would be of consequence to the action only if reliance on the policy would constitute a defense [11] to the discharge.

Although the question whether evidence of a confidentiality policy is relevant and admissible in actions such as the present has not been specifically addressed in this Circuit, because similar policies have been considered in other contexts it is possible to identify factors pertinent to whether the proffered evidence is relevant. Therefore, the policy would constitute a defense only if it (1) factually existed, (2) was consistent with other state statutes and regulations, (3) was not vague,[12] (4) did not proscribe protected first amendment speech overbroadly,[13] (5) was communicated to the appellee and (6) was not void as a matter of public policy in its instant application. In view of the contingency of admissibility of this evidence and the possibility of confusion to the jurors, should it have been improperly admitted, the court did not err in determining admissibility by means of a preliminary hearing. Nor did the court err in its final determination that the evidence of confidentiality was inadmissible.[14]

**11.** Although the appellants have strenuously argued the factual existence of the confidentiality policy, they have not focused upon whether such a policy would constitute a defense to the firing. The analysis under the first amendment with regard to a discharge for communication is the same regardless of the existence of a confidentiality policy: the *Pickering* balancing test. *See* n. 13 *infra*. Therefore, this court is able to determine that the policy would only bear on two possible defenses: (1) breach of contract and (2) good faith immunity.

In *Snepp v. United States* and *United States v. Snepp, appeal dismissed*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980), the Supreme Court held that breach of a secrecy agreement could give rise to a constructive trust in lieu of contract damages. Although the opinion was clearly based upon contractual grounds, the Court recognized that the contract had not abrogated the first amendment.

In the instant case, the contract binding Williams to the University police force provided in part:

Clear disregard for the civil rights of any person such as malicious arrest or searches, verbal or unjustified physical abuse, extortion or other clear abuse of the police power will result in dismissal.

Revealing anything of a confidential or private nature that is made known to the officer in his official capacity (unless such revelation is necessary in the performance of duty) will result in disciplinary action. (Def. Ex. 3).

Although it is questionable both that Williams' action constituted an "abuse of the police power" and that dismissal is included within the scope of "disciplinary action," had a policy of confidentiality existed it would have been relevant to the existence of a *Snepp*-type breach of contract defense. Even had the contract been breached, however, the contract itself, together with the policy, would still have had to pass constitutional muster under *Pickering*. *See Snepp supra*, n. 3.

The existence of a policy of confidentiality would have been relevant to a good faith immunity defense. That is, had a policy of confidentiality existed and the appellants relied on its decision to discharge Williams, such evidence as to an immunity defense would have existed sufficient to go to the jury as to good faith of appellants. See discussion of the immunity defense *infra*.

**12.** *See, e. g., Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

**13.** Whether a discharge resulting from communication or other first amendment activity is based upon violation of an already existing restriction or policy or is merely in retaliation has no bearing except perhaps as to factors involved in the constitutional analysis. The question in both is resolved by balancing the interest of the government with that of the employee. *See e. g., Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (no restriction); *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (no restriction); *Civil Service Comm'n v. Letter Carriers*, 413 U.S. 548, 564–65, 93 S.Ct. 2880, 2889-2890, 37 L.Ed.2d 796 (1973) (restriction); *Buckley v. Valeo*, 424 U.S. 1, 25–28, 96 S.Ct. 612, 637-639, 46 L.Ed.2d 659 (1976) (restriction).

**14.** It must be noted that the quality and quantity of evidence necessary to constitute a question for the jury varies from factor to factor depending upon whether the factor is factual or legal. For example, whether a policy of confidentiality existed in the department and its parameters is wholly factual. A very slight degree of evidence would suffice to enable the question to go to the jury *if* the other factors were satisfied. On the other extreme the consistency of the department's policy with other state law is almost wholly a question of law. In the latter situation, the determination lies

With these factors in mind, a review of the district court's decision effectively eliminating the appellants' defense may be undertaken. Although appellants offered the slight amount of evidence necessary to establish a jury question as to the theoretical existence of a confidentiality policy, the other necessary factors were not met. Most importantly, the alleged policy was contrary to a state statute and its implementing regulations. The regulations to Ga.Code Ann. § 68–1606 provide that uniform accident reports are to be made available to the general public for examination and copying. During the hearing, the appellants argued that the regulations applied only to the report form, not to the supplemental page, and that the supplemental page was therefore cloaked with confidentiality. As a matter of law, however,

and as the trial judge held, this contention is erroneous. As established by the regulation, the uniform report manual, and testimony, the supplemental involved here is a part of the uniform report and therefore should have been freely available to the public.[15] Because the question of whether the policy conflicted with other laws is a question of law, the determination was properly within the province of the court. Nor did the court err in holding that the alleged confidentiality conflicted with applicable state law. Although the court below found that the other factors had not been satisfied,[16] the existence of the conflict with state law suffices to support the court's discretionary determination that evidence of the confidentiality policy was inadmissible.[17]

with the court. As a corollary, this court reviews the latter situation free of the clearly erroneous rule. *Causey v. Ford Motor Co.*, 516 F.2d 416, 420 21 (5th Cir. 1975).

**15.** See Item 57 of the Uniform Motor Vehicle Accident Report Instruction Manual.

**16.** Moreover, testimony failed to establish that to the degree necessary to constitute a jury question the alleged confidentiality policy was ever communicated or otherwise made known to the appellee. Additionally, if a policy existed at all, it was vague as a matter of law because it was neither expressly formulated nor consistently applied. Testimony established that the secretaries who maintained the files determined which part of the reports were "confidential" and which were public. Moreover, the weight of the testimony established that "interested persons" could obtain the entire file, only with permission of appellant Saye. Therefore, it could not reasonably be maintained that the policy had been authoritatively construed to provide specificity. *See Parker v. Levy*, 417 U.S. 733, 752, 754, 94 S.Ct. 2547, 2560, 41 L.Ed.2d 439 (1974); *Arnett v. Kennedy*, 416 U.S. 134, 160, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

Finally, the court determined that even if a policy existed, it would be void as a matter of public policy because the public must be informed of the malfeasance of public officials. Of course, a prerequisite of the last determination is the *fact* that the records were illegally altered, which the record establishes to the extent that a reasonable jury could not hold otherwise. Because of the foregoing, the court was within its discretion in holding that evidence tending to establish a policy of confidentiality was irrelevant and immaterial and there-

fore all appellants' claims based upon this determination must fall.

**17.** A special word is necessary regarding the claim by appellants that the court erred in instructing the jury that if it finds that the appellants fired appellee because of his public disclosure of either the final report or the original, it would be entitled to find against the defendants. Appellants contend that the court effectively directed a verdict against them because their defense was precisely that appellee had been fired for divulging the documents. This instruction evolved from three valid conclusions of law: (1) no policy of confidentiality existed, (2) no *Pickering* defenses were available and (3) insufficient evidence existed to frame a jury question as to good faith immunity. Moreover, this instruction merely sets forth the elements of a prima facie case. *See Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). As a matter of law, appellant had no valid defenses to the firing *if* it was because of the communication. Appellants were free to argue and prove that the discharge would have occurred absent the communications at issue but they did not. *See Givhan v. Western Line Consolidated School Dist.*, 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979).

At oral argument the standard of review to be employed by this court was discussed. Because there is no sufficiency of the evidence claim with respect to the motive for the discharge, it is immaterial whether this case is analyzed as jury verdict or a directed verdict. With respect to matters of law, the standard of review is the same.

The appellants next claim that the court erred in refusing to permit the appellants to offer evidence and to charge the jury as to so-called *Pickering* defenses. In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court addressed the constitutionality, under First Amendment principles, of the discharge of a teacher for writing a letter to the local newspaper critical of the Board of Education. Although the Court held that the discharge was impermissible under the circumstances, it also noted that the First Amendment is not an absolute shield for critical employees of states or municipalities even if the criticism is true. Specifically, the Court stated that considerations such as the need for confidentiality, the relationship of subordinate to the superior, and whether their relationship would be undermined by the criticism would also be relevant to the lawfulness of discharge. Although the Court refused to speculate as to what effects these factors would have on the ultimate determination in the future, it did hold that whether speech of a public employee is protected depends upon "a balance between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734–1735.[18]

Specifically, the appellants argue that evidence tending to establish two of the *Pickering* defenses, the necessity of discipline in a quasi-military organization and the breakdown of the working relationship between superior and subordinate, should have been admitted and the jury charged accordingly. As with the proffered confidentiality evidence, the trial court allowed the issue to be developed at a preliminary evidentiary hearing. Subsequently, the judge ruled that as a matter of law the defenses would be unavailable, and, therefore, the evidence was irrelevant under Fed.R.Evid. 401.

This circuit has consistently recognized the availability of the *Pickering* defenses, where applicable. In *Abbott v. Thetferd*, 534 F.2d 1101 (5th Cir. 1976), this court sitting en banc adopted the dissent of the earlier panel decision, 529 F.2d 695, 702 (5th Cir. 1976), holding that in weighing the interests of the state versus that of the citizen employee the importance of confidentiality and harmony would be relevant. *Abbott* involved the dismissal of a court clerk for filing lawsuits in contravention of a judge's rule against litigiousness. Additionally, the court held that the balance of interests would be struck in light of the "time, place and circumstances" of the expression, that is, its appropriateness. In arriving at its ruling that dismissal of the clerk was proper, the peculiar needs of the court in the marshaling of its employees was a prime factor in the court's determination. Both before and since *Abbott* the importance of harmony in close working relationships and proper performance of an employee's duties have been stressed. *Lindsey v. Board of Regents*, 607 F.2d 672 (5th Cir. 1979); *Garza v. Rodriguez*, 559 F.2d 259 (5th Cir. 1977); *Ayers v. Western Line Consol. School Dist.*, 555 F.2d 1309 (5th Cir. 1977), *vacated sub. nom.*, *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Smith v. United States*, 502 F.2d 512 (5th Cir. 1974); *Pred v. Board of Public Instruction*, 415 F.2d 851, 858–59 (5th Cir. 1969).

Appellants contend that because they and Williams occupied such a relationship, evidence of future disruption should have been admitted in order for the court to arrive at

---

18. It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases.
391 U.S. at 570 n.3, 88 S.Ct. at 1735.

a proper balance under *Pickering*. Ordinarily, the closeness of a working relationship and the threat and extent of disruption would be a factual question for the jury. The ultimate balancing of the interests of citizen and state with regard to first amendment protection, however, remains in the sphere of the court. Because of this responsibility, as a preliminary matter it was necessary for the court to determine, viewing the appellants' evidence most favorably and extending every reasonable inference in their favor, whether the disruption or disharmony and breakdown of discipline would overbalance Williams' and/or the public's interest in the communication. If the balance could not be struck in appellants' favor no matter what the extent and weight of evidence, it would be futile, a waste of time, and prejudicially misleading to develop the evidence before the jury.

Viewed in the light most favorable to appellants, it was established that the "leak" of the altered report would irreparably damage the working relationship between appellants and Williams. Although Saye was not Williams' immediate superior, there was frequent communication and necessity for working together. It is clear, therefore, that disharmony would result. Additionally, as appellants argue, discipline is a necessary component of a smoothly-operating police force. Although this necessity of discipline does not rise to the same level as required by the military, *see Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), discipline must be maintained among police officers during periods of active duty.

Arrayed against this very real threat of disruption, disharmony and breakdown of discipline was appellee's interest as a citizen and as an employee in the communication. Most importantly, the appellee was communicating regarding a matter of public concern. Although it has been often stated that First Amendment protection is not dependent upon the "social worth" of ideas, *see Police Department of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 217 (1972); *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542, 549 (1969); *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131, 1134 (1949), the nature of the communication is relevant to the balancing of the interests of the employee as citizen against the interest of the governmental unit. When the matter is as important to the public as that involved here, the employee's right to speak must be vigorously protected if the public is to be informed. *See Lindsey v. Board of Regents*, 607 F.2d 672 (5th Cir. 1979); *Atcherson v. Siebenmann*, 605 F.2d 1058, 1063 (6th Cir. 1979). The falsification of an official document by one official for the protection of another official is such a grave miscarriage of the public trust that such conduct must be disclosed to the public if the *people* are to remain the true sovereigns in this country. Additionally, the alteration of the records involved Williams, as employee, intimately: because he was the officer on duty and signed the original report, the alteration appeared to contain his imprimatur and would have implicated him in the fraud. This fear was communicated to the appellants with no success. Furthermore, the disclosure occurred in reasonable "time, place and circumstances": the appellee was off duty when the communication was made and the communication did not involve direct disobedience of a superior's orders. Because appellee was implicated on the face of the altered report and had no success with his superiors, it was not unusual that an employee in appellee's circumstances would seek advice from a respected source, here, his father. That the father then passed on the information cannot be subject to complaint: Williams' father felt himself bound by his duty as a citizen to expose official corruption made known to him, rather from any bias or malice.

■ Based upon the foregoing, the district court was correct in its reading of the scales in favor of First Amendment protection. Although the threat of disruption was great and discipline is important to a quasi-military organization, these interests, whether taken singly or in combination, do not overcome the interest of the individual

here. We do not read *Abbott* and its progeny as establishing disruption and disharmony as a *per se* defense to dismissal no matter how egregious the complained of conduct of the superior might have been. Of course, the disruption could be cured if the working relationship were extinguished. What appellants have failed to address is why the *innocent*, perhaps praiseworthy, appellee should lose his job.[19]

The appellants next contend that the court erred in refusing to charge the jury as to the qualified immunity to which they claim entitlement under the doctrine of "official immunity." The trial court denied the proffered charge on the basis of insufficiency of evidence demonstrating that appellants should not have reasonably known that they were violating appellee's constitutional rights, citing *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Appellants level two arguments: (1) The preclusion of evidence showing a policy of confidentiality prevented a demonstration of facts sufficient to go to the jury and (2) the court erroneously construed *Wood v. Strickland* to require a greater degree of legal acumen than is consonant with "good faith."

 The appellants, however, misread *Wood v. Strickland.* In that decision the Supreme Court announced a disjunctive test for establishing the lack of good faith:

whether "he knew or reasonably should have known that the action he took . . . would violate the constitutional rights of the student affected or if he took the action with malicious intention to cause a deprivation of constitutional rights or other injury to the student." 420 U.S. at 322, 95 S.Ct. at 1001. Under the second prong of this test, it is unnecessary to address the depth of appellants' legal knowledge because of the "other injury" proviso. That is, if the evidence demonstrated a malicious intent to injury Williams so inconsistent with good faith that no reasonable jury would hold otherwise, the refusal of the charge would be correct. Based upon the record the court did not err. First, appellants attempted to rely on a nonexistent confidentiality policy, inconsistent with state law and never communicated to the appellee. Moreover, the discharge resulted after the *appellants* had engaged in a wrongdoing. Additionally, the circumstances of the discharge, i. e. the timing, the anger, and the method all evidenced malicious retaliation. The unfounded threats of suit and of GBI investigation coupled with statements to the news media that appellee had political motivations in making the reports public establishes an intent to injure the appellee both in his person and his reputation. The court was correct in determining that a reasonable jury could not have found that the appellants had acted in good faith and, therefore,

19. Under a related theory, the appellants, citing *Sprague v. Fitzpatrick*, 412 F.Supp. 910 (E.D. Penn.1976), contend that the disclosure so impugned the honesty of the appellants that Williams should have expected to be fired. *Sprague* involved a dismissal of an assistant district attorney for publicly criticizing the district attorney's handling of plea bargain cases. The district court held, that under the circumstances, the assistant should have anticipated that discharge would be the probable consequence of his action and that therefore the dismissal was proper. In the instant case, it might be factually argued that Williams should have expected to be fired given the character of his disclosure.

Constitutional protection, however, especially that of the First Amendment, cannot be limited by a doctrine so foreign to constitutional law as assumption of the risk if an informed public is to be maintained. Indeed, the rule of expectation urged by the appellants and approved of in *Sprague, supra*, can lead to an absurd result: the more shocking the conduct of a superior, the greater need for the public to know. However, the rule of expectation would prevent an employee from commenting because he would expect to be fired for exposing shocking conduct. Sound First Amendment analysis requires that the quality and nature of the speech be balanced with the exigencies of the work place but with the far greater weight attached to the interest of the public. Moreover, the proper balance is a legal question rather than one of fact. Here, although the working relationship of the parties is damaged, this exigency pales before the need of the public to know of the malfeasance involved, and the *right* of the appellee to make it known both for his own protection and as his duty as servant to the people. Therefore, the court below was correct in holding that the *Pickering* defenses were unavailable as a matter of law.

did not err in preventing the defense from going to the jury. This conclusion is buttressed by the fact that the jury awarded punitive damages, evidencing a determination of maliciousness.

 Finally, the appellants contend the court erred in failing to direct a verdict (or judgment notwithstanding the verdict) on the issues of punitive and compensatory damages because of insufficient evidence. In a § 1983 action damages must be proved, rather than presumed. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Here, there was ample evidence to support the existence of compensatory and punitive damages. The appellee was discharged in the midst of an election campaign. Publicity cast doubt upon his integrity, affecting his ability to campaign. The firing itself was done in a heavy-handed and inflammatory manner. Although Williams eventually won the election, the doubt and resulting mental anguish during the period of indecision would support the compensatory award. With respect to punitive damages the record is also clear. The appellants were objectively guilty of malfeasance and appellee did his duty by the public. In retaliation he was discharged and subsequently maligned in the press. Moreover, appellants relied on a facially inapplicable confidentiality policy to support their decision. Therefore, we hold that sufficient evidence of damages, both compensatory and punitive, existed to frame a jury question.

We have considered the appellants' other claims of error [20] and find them without merit. We accordingly AFFIRM.

20. Appellants also claim:
 1. The district court erred in denying Chief Saye's motions for a directed verdict (and subsequently for judgment notwithstanding the verdict) based upon the uncontroverted evidence that he had no part in the decision made by Director Kassinger to discharge Lt. Williams—this decision being made by Director Kassinger alone.
 2. The court erred in instructing the jury (a) that it could award compensatory damages for "mental anguish, damage to character and reputation, humiliation, public embarrassment which any person would suffer as a result of such constitutional deprivation," even though no monetary damages had been shown; and (b) that it could also award "punitive damages" to Lt. Williams.
 3. The district court erred in refusing to grant a new trial on the ground that based upon the evidence presented the verdict is excessive.