**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0584n.06

Case No. 18-1050

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| | | **FILED**<br>Nov 26, 2018<br>DEBORAH S. HUNT, Clerk |
| ROSEMARIE E. AQUILINA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| GENE WRIGGELSWORTH; CHARLES | ) | MICHIGAN |
| BUCKLAND, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: GILMAN, KETHLEDGE, and BUSH, Circuit Judges.**

**JOHN K. BUSH, Circuit Judge.** Rosemarie E. Aquilina, an elected judge on the 30th Circuit Court of Michigan for Ingham County, appeals the district court's order granting summary judgment to Gene Wriggelsworth and Charles Buckland on her claim for First Amendment retaliation and the district court's decision not to exercise supplemental jurisdiction over her state-law claim for false light invasion of privacy. Aquilina alleges injuries arising from a publicized criminal investigation of her conduct after she authorized the release of courtroom security video footage to a news reporter. Wriggelsworth was Ingham County's sheriff, who initiated the investigation, and Buckland is a detective in the sheriff's office. For the reasons that follow, we **AFFIRM**.

1

## I. FACTS

On August 2, 2016, a criminal defendant (Joshua Harding) used a shank to attack an assistant prosecutor during trial in an Ingham County Circuit Court courtroom. The assault was captured on video by the courtroom security recording system, to which only court staff, security, and IT personnel had access. The next day, August 3, Matt Mencarini, a reporter from the Lansing State Journal, called Aquilina and asked for permission to view the security video. Aquilina agreed and instructed her judicial assistant, Allison Hayes, to play the video for Mencarini. Aquilina then allowed Mencarini to record the security footage on his cell phone. Shortly afterwards, Mencarini contacted Aquilina again and notified her that he planned to publish the video. Aquilina did not object.

Mencarini also called Wriggelsworth and asked whether the Sheriff's Office planned to release the video; Wriggelsworth told him no. Mencarini then informed Wriggelsworth that he already had a copy of the video, but he refused to tell Wriggelsworth how or from whom he had obtained it.

Because Harding had been charged criminally for his courtroom attack on the assistant prosecutor, the video was potential evidence against Harding. Wriggelsworth told Detective Sergeant Greg Harris to investigate the video's release. In turn, Harris assigned Buckland to the matter, and they discussed whether the video's release might form the basis of criminal charges.

Harris and Buckland also discussed the video's release with Ingham County Chief Assistant Prosecuting Attorney Lisa McCormick. The three officials discussed whether the crime of obstruction of justice may have been committed and concluded they had grounds to continue investigating.

Buckland then obtained a list of all court employees who had accessed the video, which led him to Allison Hayes, Aquilina's judicial assistant. Based on information that Hayes's computer had accessed the video on the day it was published in the press and on the statement of an observer who claimed to have seen Mencarini with Aquilina in her chambers, Buckland spoke to Hayes. Hayes told Buckland to speak to Aquilina's attorney if he had any questions, and when Buckland contacted Aquilina, he got the same answer. After speaking to several other court staff members and judges, who substantiated Buckland's belief that Aquilina's chambers had released the video, Buckland wrote a report summarizing his investigation.

On August 30, 2016, Buckland submitted a warrant request to the Ingham County Prosecutor's Office requesting that charges of obstruction of justice and abuse of public office be brought against Aquilina. On August 31, Ingham County Prosecutor Gretchen Whitmer filed a petition for appointment of a Special Prosecutor in the Michigan Attorney General's Office.

On September 22, 2016, both the criminal charges against Harding and the existence of the investigation of Aquilina were reported by the press. In their depositions, Wriggelsworth and Buckland stated that they never told the press they were investigating Aquilina. Aquilina stated in her affidavit that she had "been unable to find out who leaked the existence of the investigation to the press." (R. 54-5, Page ID# 552.) Despite the investigation, no charges were ever brought against Aquilina.

## II. PROCEDURAL BACKGROUND

On September 23, 2016, Aquilina sued Wriggelsworth and Buckland, asserting two causes of action: a claim under 42 U.S.C. § 1983 for retaliation in violation of her First Amendment rights and a tort claim under Michigan law for false light invasion of privacy. After discovery, Wriggelsworth and Buckland moved for summary judgment. The district court granted the

motion, reasoning that Aquilina did not engage in protected First Amendment conduct when she released the video. *See Aquilina v. Wrigglesworth* [sic], 298 F. Supp. 3d 1110, 1112, 1116 (W.D. Mich. 2018). In addition, the district court declined to exercise supplemental jurisdiction over Aquilina's state-law tort claim. *Id.* at 1116.

## III. STANDARD OF REVIEW

This court reviews a grant of summary judgment de novo. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment is appropriate if, viewing all evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted) (quoting Fed. R. Civ. P. 56(a)). Furthermore, a court should consider only admissible evidence in determining whether a dispute of fact exists. *See* Fed. R. Civ. P. 56(c)(2); *Tranter v. Orick*, 460 F. App'x 513, 514–15 (6th Cir. 2012) (quoting *Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)). In reviewing a grant of summary judgment, we "may affirm on any ground supported by the record." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 n.2 (6th Cir. 2008) (citations omitted).

We review a district court's decision not to exercise supplemental jurisdiction for abuse of discretion. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). "An abuse of discretion exists only when the court has the definite and firm conviction that the district court made a clear error of judgment in its conclusion upon weighing relevant factors." *Id.* (citation and internal quotation marks omitted).

## IV. DISCUSSION

To prevail on her First Amendment retaliation claim, Aquilina must prove three elements: "(1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant[s']

adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights." *Mattox v. City of Forest Park*, 183 F.3d 515, 520 (6th Cir. 1999) (citation omitted); *accord Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). The district court granted summary judgment to Wriggelsworth and Buckland based on its conclusion that Aquilina failed as a matter of law to establish the first element.

As we explain below, the district court's ruling was in error. However, we uphold the entry of summary judgment for Wriggelsworth and Buckland on the alternative ground that Aquilina has failed to raise a genuine dispute of material fact that would allow a reasonable jury to decide in her favor as to the third element. In the following discussion, we address the first and third elements in turn.

A. Constitutionally Protected Activity

On the question whether a plaintiff's speech is protected, the Supreme Court has made clear that government employees' speech is subject to a two-part test. Under *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), the plaintiff must have engaged in speech (1) as a citizen (2) on a matter of public concern. Here, the parties do not dispute that the release of the video is speech[1] that implicated a matter of public concern, namely courthouse security.

---

[1] We assume without deciding that Aquilina engaged in "speech," as that word is used in the First Amendment, when she allowed Mencarini to view and record the courthouse security video. We note, however, that this assumption may not be so clear-cut if Aquilina's conduct is viewed as purely ministerial in nature. *Compare Voting for Am., Inc. v. Steen*, 732 F.3d 382, 391 (5th Cir. 2013) ("[T]he receipt and delivery of completed voter-registration applications" are "non-expressive activities."), *and Garman v. U.S. Postal Serv.*, 509 F. Supp. 507, 510 (N.D. Ind. 1981) (stating that the processing of draft registration forms is a ministerial task that is not speech), *with Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 629 F.2d 993, 1003 (5th Cir. 1980) (analyzing the leaking of an altered police report and the original unaltered report as speech in a wrongful discharge action).

Therefore, to determine whether Aquilina's speech was protected, we must determine whether she spoke as a citizen. The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . ." *Id.* at 421. Furthermore, "official duties" are not necessarily limited to a written list of routine responsibilities but may include other "duties an employee actually is expected to perform," as established by the employer's and employee's expectations. *Id.* at 424–25.

These principles guided the Supreme Court in *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014), which concerned a community college program director who alleged that he was fired in retaliation for testimony he gave at the trial of a former employee whom he, in turn, had fired earlier. *Id.* at 2375–76. The Court noted that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.* at 2379. The Court held that although Lane testified "regarding the events that led to his terminating" the former employee, his testimony was ultimately compelled by his "obligation, as a citizen, to speak the truth" and therefore did not occur in the course of his official duties. *Id.* at 2375, 2379.

This court has applied *Garcetti* and *Lane* in differing contexts to determine whether a public employee spoke as a citizen. In a decision that predated *Lane*, we held that the plaintiff—a park ranger (Weisbarth) who made statements to a paid consultant hired by Weisbarth's managers to evaluate her department—was not speaking as a citizen but rather as a public employee pursuant to her official duties. *See Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 540–41 (6th Cir. 2007). To determine whether Weisbarth spoke as a citizen, we applied four factors: "[1] the impetus for her speech, [2] the setting of her speech, [3] the speech's audience, and [4] its

6

general subject matter." *Id.* at 546. Considering the circumstances, we held that Weisbarth's comments had been made in the course of her official duties and could not form the basis of a First Amendment claim. *Id.* We noted that the park district had "hired [the consultant] for legitimate departmental business, and the topics about which he questioned Weisbarth—employee morale and performance—obviously concerned her day-to-day official duties." *Id.* at 545.

In contrast with our conclusion as to Weisbarth, we held that a public employee had engaged in speech as a citizen in *Boulton v. Swanson*, 795 F.3d 526, 533 (6th Cir. 2015), a post-*Lane* decision. The plaintiff in *Boulton* had made statements about departmental training as part of a labor arbitration in which he participated as a union leader. *Id.* at 534.

With these cases in mind, we address whether Aquilina's speech was protected. We begin with the first *Weisbarth* factor, the impetus for the speech. *See Weisbarth*, 499 F.3d at 546. Aquilina suggests that she was acting because of her concern for court security. *See* Appellant Br. at 20–21. This motivation cuts both ways. On the one hand, she was probably particularly concerned about court security because of her position as a judge. On the other hand, it is plausible that Aquilina was concerned as a citizen as well and thought other citizens should know that armed attacks could occur in courtrooms.

The second *Weisbarth* factor—the setting of Aquilina's speech—augurs well for finding her speech was not protected. As Wriggelsworth and Buckland point out, Aquilina had access to the video only because of her position as a judge. *See* Appellee Br. at 33. Furthermore, the context does not indicate that Aquilina's showing the video to Mencarini was driven by her concerns as a citizen. She did not, on her own initiative, decide it was time to send a message about courtroom-security issues by releasing the video. Indeed, there is no evidence that she intended to allow the public to see the video until Mencarini contacted her and asked her if he could see it. She ordered

her judicial assistant to play the video for Mencarini, and she gave him permission to view it in terms that suggested she thought her action was within her authority as a judge. When Mencarini told her he planned to publish the video, Aquilina neither encouraged him nor endorsed his action: she simply told him she thought it was fine for him to release it. These facts suggest that both Aquilina and Mencarini understood her allowing him to record the video to be a decision made in her discretion as a public employee who had access to it.

But the third *Weisbarth* factor—the speech's audience—supports the conclusion that Aquilina spoke as a citizen outside her public-employee duties. The immediate audience was Mencarini; the ultimate audience, the public at large. There is no evidence that communicating to the public on matters of courthouse security was part of Aquilina's duties as a judge. Such speech seems to be more the type of discourse engaged in by ordinary citizens.

By the same token, addressing the last *Weisbarth* factor, the speech's subject matter of courthouse security related to Aquilina's position but had nothing to do with her duties. The situation calls to mind our recognition in *Boulton* that "a public employee may speak as a citizen even if his speech involves the subject matter of his employment." 795 F.3d at 534 (citation and internal quotation marks omitted).

We view all these factors in light of *Lane*'s admonition that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech" from protected speech into unprotected speech. 134 S. Ct. at 2379. True, Aquilina acquired the video by virtue of her position, but its release had nothing to do with her job. Given that our court has read *Lane* as "rejecting an expansive reading of the *Garcetti* exception," we should use caution in finding a public employee's speech is unprotected in novel factual situations. *Boulton*, 795 F.3d at 533. In sum, based on the circumstances here, the district court went too far

when it applied *Garcetti* to determine that Aquilina's releasing the video was unprotected speech as a matter of law.

Nevertheless, we may uphold the entry of summary judgment if it is warranted on any alternative basis supported by the record, *see Hunt*, 542 F.3d at 534 n.2, so we now turn to the third element of Aquilina's retaliation claim: the motivation for the defendants' "adverse action," *Mattox*, 183 F.3d at 520.

B. Motivation for Adverse Action

When we consider the element of adverse action, "the subjective motivation of the defendants is at issue." *Thaddeus-X*, 175 F.3d at 399. The plaintiff must substantiate her allegations about the defendant's motives: "[B]are allegations of malice [do] not suffice to establish a constitutional claim" at the summary judgment stage. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (alterations in original) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998)). The plaintiff may use circumstantial evidence to support an inference of retaliatory motive. *See Harris v. Bornhorst*, 513 F.3d 503, 520 (6th Cir. 2008) (quoting *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996)). If the plaintiff demonstrates that her "protected conduct was a motivating factor . . . [,] the burden of production shifts to the defendant," who must respond with legitimate reasons for his actions. *Thaddeus-X*, 175 F.3d at 399 (citation omitted). "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.*

Aquilina fails to offer sufficient evidence of retaliatory motive even to shift the burden to Wriggelsworth and Buckland. Therefore, they must prevail on summary judgment.

In direct-evidence cases, we have considered statements made by defendants that suggested animus toward the plaintiff, see, for example, *Harris*, 513 F.3d at 519–20, or evidence that the

plaintiff was treated differently than other, similarly situated individuals, see, for example, *Vereecke*, 609 F.3d at 402. Aquilina points us to no such statement or differential treatment at the hands of Wriggelsworth or Buckland that would suggest that they meant to target her rather than to investigate whether a crime had been committed and, if so, who had committed it. Instead, she offers speculation and surmise about their motives.

For instance, Aquilina asks us to believe that she must have been retaliated against because there was no real basis for the investigation. Repeatedly referring to the investigation as a "fake criminal investigation," see, for example, Appellant Br. at 22, she urges that there was "no crime" to be investigated, *id.* at 33, and that Wriggelsworth and Buckland wanted simply to "label her a criminal," *id.* at 31. Wriggelsworth, on the other hand, indicated in his deposition that at the time he ordered Harris to begin the investigation, he did not know who had released the video. Furthermore, Wriggelsworth claimed that he simply told Harris to investigate the release, without specifying whether the investigation should focus on finding evidence for criminal charges.

What is more, Wriggelsworth was not alone in his belief that the release of the video was a serious mistake that deserved investigation: Harris's and Buckland's pre-investigation discussion with Assistant Prosecuting Attorney McCormick, at which Wriggelsworth was not present, also resulted in the three officials' suspecting that a crime may have been committed. Although the prosecutor's office ultimately decided not to charge Aquilina, the barren result of an investigation is not necessarily evidence that it was begun in bad faith.

As for Buckland's involvement in the investigation, both his and Wriggelsworth's depositions showed that Buckland was simply following orders that he received from Harris, who in turn got his orders from Wriggelsworth. Furthermore, both Wriggelsworth and Buckland

claimed that Wriggelsworth was not involved in the investigation at all after he gave Harris the order to begin investigating. Aquilina offers no evidence to discredit their claim.

Having shown no direct evidence, Aquilina also fails to provide circumstantial evidence to support a finding of retaliatory motive. In past cases, we have looked to factors such as the "temporal proximity" between the exercise of the plaintiff's allegedly protected conduct and the allegedly retaliatory action to supply the inference of intent. *See, e.g.*, *Vereecke*, 609 F.3d at 400–01. Here, using temporal proximity as an indicator would not produce any such inference. The immediate investigation of the video's release is equally consistent with Aquilina's story (that the investigation was motivated by retaliation) and with Wriggelsworth's and Buckland's (that it was motivated by a belief that court policy or criminal law may have been violated and by a desire to find out who was culpable). Thus, we cannot simply ask whether Wriggelsworth and Buckland "would have taken the same action in the absence of" the video's release. *Thaddeus-X*, 175 F.3d at 399. Instead, we ask whether the video's release may properly have been the subject of an investigation so long as Wriggelsworth and Buckland did not act with the wrong motives. Because Wriggelsworth and Buckland both stated that they considered the video to be evidence of a crime (Harding's courtroom attack), and both Wriggelsworth and Buckland were law enforcement officers, investigating the video's release would not appear extraordinary for them to do while acting from the best of motives. Aquilina's brief does not give us a reason to doubt that the investigation was begun in good faith. She therefore offers no circumstantial evidence supporting a reasonable inference of retaliatory motive.[2]

---

[2] Aquilina does allege that a long history of "friction" between her and Wriggelsworth, on matters such as courthouse security, underlay Wriggelsworth's actions. *See generally* Appellant Br. at 4–10. Her insistence on detailing this history strikes us as odd. Aquilina does not allege that any of her past interactions with Wriggelsworth were protected or that her alleged past interest in courthouse security was manifested in protected ways. Instead, she appears to hope that we take her backstory with Wriggelsworth into account in finding his ordering the investigation was a mere product of spite. However, even if we assumed for the sake of argument that Wriggelsworth was motivated by spite, Aquilina has no theory of why his feelings would transform the investigation into a constitutional violation, since she

We do not believe that a reasonable jury could hear all the evidence Aquilina has of Wriggelsworth's and Buckland's motives—exactly none—and find that they initiated and pursued the investigation from retaliatory motives.[3]

To the extent Aqulina's retaliation claim relies on the publicization of the investigation rather than the investigation itself, her theory fails again because she admitted she does not know who told the press about the investigation. Both Wriggelsworth and Buckland claimed that they did not tell. We do not see how Aquilina can claim that Wriggelsworth and Buckland retaliated against her by publicizing the investigation when she does not show that they publicized it in the first place. Nevertheless, Aquilina suggests that by initiating the investigation, Wriggelsworth and Buckland should have expected that it would become public. *See* Appellant Br. at 29. Although that may be true, Aquilina's efforts in this vein are more relevant to her attempt to use the investigation itself as the basis for her claim than the extent to which it was publicized. And, as we have discussed, Wriggelsworth's and Buckland's actions in undertaking the investigation itself do not support her claim.

Finally, Aquilina urges that the question of a defendant's subjective motivation is rarely proper for resolution at summary judgment. *See id.* (citing *Bloch v. Ribar*, 156 F.3d 673, 682 (6th

---

does not allege that her past actions—those related to courthouse security or any others—were protected. Her only basis for the constitutional claim is her argument that the release of the video was protected. If anything, Aquilina's frequent hearkening-back to her history with Wriggelsworth weakens the connection between her allegedly protected conduct and the investigation.

[3] In addition to the evidence discussed here, Aquilina relies on various fragments of hearsay that she gleaned during discovery to support her theory of Wriggelsworth's and Buckland's bad motives. Because these items are inadmissible hearsay and are not corroborated by admissible evidence or documents that would lead to admissible evidence at trial (such as sworn affidavits or depositions), we do not consider them in the body of evidence from which a reasonable jury would reach its verdict. *See Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997) ("Rule 56 requires the plaintiff to present evidence of evidentiary quality that demonstrates the existence of a genuine issue of material fact. Examples of such evidence include admissible documents or attested testimony, such as that found in affidavits or depositions. The proffered evidence need not be in admissible *form*, but its *content* must be admissible." (citations omitted)).

Cir. 1998)). We recognize the central role of the factfinder in retaliation cases where both parties present some facts to support their motivation arguments. "Nonetheless, a court may grant summary judgment even in a causation [i.e., motivation] inquiry, where it is warranted." *Hartsel*, 87 F.3d at 803 (citation omitted). Here, it is warranted.

In sum, Aquilina has failed to create a genuine dispute of material fact regarding whether Wriggelsworth and Buckland were motivated by a desire to retaliate against her for engaging in protected conduct. Because Aquilina has produced no evidence from which a jury could draw a reasonable inference of retaliatory motive, Wriggelsworth and Buckland are entitled to judgment as a matter of law, and the district court's entry of summary judgment in their favor was proper.

C. Remaining Issues

Two more issues remain on appeal and can be dealt with briefly.

First, Aquilina seeks review of the district court's decision not to exercise jurisdiction over her state-law claim. Under 28 U.S.C. § 1367(a), district courts have supplemental jurisdiction over state-law claims arising from the same set of facts as claims over which they have original federal-question jurisdiction. However, a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c), (c)(3); *see Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) (discussing a grant of summary judgment on federal claims as one form of "pretrial dismissal," after which "the balance of considerations usually will point to dismissing the state law claims, or remanding them . . .").

Because we review the district court's decision not to exercise supplemental jurisdiction for abuse of discretion, *Gamel*, 625 F.3d at 951, we should not find that it improperly declined to exercise supplemental jurisdiction here. *See Wee Care Child Ctr., Inc. v. Lumpkin*, 680 F.3d 841,

849 (6th Cir. 2012) (finding no abuse of discretion where district court declined to exercise supplemental jurisdiction over state-law claims after dismissing federal claims). The district court resolved Aquilina's federal-question claim before trial and then determined that "[a] state court should have the opportunity to consider the merits of the Plaintiff's state law claim." *Aquilina*, 298 F. Supp. 3d at 1116. Under § 1367(c)(3), that determination was well within the district court's discretion.

Finally, Aquilina raises the question whether we may review Wriggelsworth's and Buckland's motion for sanctions under Federal Rule of Civil Procedure 11, on which the district court never ruled. *See* Appellant Br. at 2. Because there is no ruling to appeal, there is nothing for us to review.

## V. CONCLUSION

Aquilina has failed to raise a genuine dispute of material fact on the third element of her First Amendment retaliation claim, and the district court acted within its discretion in declining to exercise supplemental jurisdiction over Aquilina's state-law claim. We therefore **AFFIRM** the judgment of the district court.