**Brian SHEPPARD, Plaintiff,**

v.

**Leon BEERMAN, Defendant.**

**No. 91 CV 1349(ILG).**

United States District Court,
E.D. New York.

Feb. 7, 2002.

Brian Sheppard, New Hyde Park, NY, pro se.

Amy L. Abramowitz, Ass't. Attorney General's Office, Michael B. Siller, Office of the Attorney General, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

Plaintiff Brian Sheppard alleges in this action that defendant former Supreme Court Judge Leon Beerman terminated him from his position as a law clerk in violation of his free speech rights under the First Amendment to the United States Constitution. Now before the court is Judge Beerman's motion for summary judgment, as well as Sheppard's cross-motion to strike certain evidence relied upon by Judge Beerman in his motion. For the reasons that follow, Judge Beerman's motion must be granted and Sheppard's cross-motion must be denied.

## Procedural History

Before turning to the motion, the procedural history of this case is briefly recounted. Plaintiff commenced this action in April 1991. Plaintiff's Complaint asserted several claims against Judge Beerman pursuant to 42 U.S.C. § 1983, including a claim that his discharge and Judge Beerman's conduct following the discharge violated his rights under the First and Fourteenth Amendments to the United States Constitution and several state law claims. In February 1992, Judge Beerman moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings. In May 1993, this Court granted Judge Beerman's motion and dismissed the case in its entirety. *Sheppard v. Beerman*, 822 F.Supp. 931 (E.D.N.Y. 1993). Sheppard appealed and, in March 1994, the Second Circuit affirmed in part and vacated and remanded in part, vacating only this Court's dismissal of Sheppard's First Amendment freedom of speech claim and holding that this Court improperly made the factual finding that the cause of Sheppard's employment termination was insubordination, rather than the exercise of his right to free speech. *Sheppard v. Beerman ("Sheppard I")*, 18 F.3d 147, 151 (2d Cir.1994). Judge Beerman again moved for judgment on the pleadings and, on December 20, 1995, this Court again granted his motion and dismissed the case in its entirety. *Sheppard v. Beerman*, 911 F.Supp. 606 (E.D.N.Y. 1995). While this Court found that Sheppard's speech was on a matter of public concern and that Sheppard had shown a *prima facie* case of unconstitutional discharge, it also found that Judge Beerman was entitled to qualified immunity because

he had acted within the realm of objective reasonableness in terminating Sheppard's employment. *Id.* at 616. Upon Sheppard's appeal of that decision, the Second Circuit again reversed, holding this time that this Court had erred in finding that Judge Beerman's actual intent was irrelevant and in not permitting plaintiff to engage in discovery to support his claim of unconstitutional motive. *Sheppard v. Beerman ("Sheppard II")*, 94 F.3d 823, 828–29 (2d Cir.1996). The parties have engaged in extensive discovery, over the course of which this Court has denied dozens of objections by Sheppard, many of them frivolous, to the Magistrate Judge's discovery rulings.

Judge Beerman now moves for summary judgment on the ground that his actions did not infringe on Sheppard's First Amendment rights and that, even if Sheppard could demonstrate such an infringement, he is entitled to qualified immunity. Sheppard also has cross-moved to strike certain deposition transcripts, affidavits and other documents upon which Judge Beerman relies in his summary judgment motion. Because Sheppard has failed to adduce any evidence, direct or circumstantial, from which it can be inferred that Judge Beerman's decision to

terminate Sheppard from his employ was prompted by anything other than a desire to ensure an effective working relationship, and the efficient conduct of his Chambers, Sheppard has failed to demonstrate the existence of a genuine issue of material fact that would permit a jury to conclude that his free speech rights under the First Amendment were violated. Summary judgment therefore must be granted as against Sheppard.

**Factual Background**

While the operative facts in this case are recited in both of the Second Circuit's opinions and in this Court's previous orders, extensive discovery—consisting of 31 depositions of Judge Beerman and his two sons, other sitting and retired judges, active and former district attorneys, and court personnel, and various document requests and interrogatories—has supplemented those facts and they therefore are summarized here.[1]

Sheppard served as a law clerk to defendant. New York State Supreme Court Judge Leon Beerman, from 1986 until his termination on December 11, 1990. Sheppard testified at his deposition that on December 6, 1990, he and Judge Beerman had a discussion concerning Judge Beerman's contemplated ruling on a speedy

---

1. Before examining Sheppard's factual allegations, a brief word must be said about the form in which those allegations have been submitted to this Court. In addition to a 43–page Memorandum of Law in Opposition to the Motion for Summary Judgment, Sheppard has filed a 116–page document labeled "Plaintiff's Statement Pursuant to Local Rule 56.1 and Federal Rule of Civil Procedure 56(E) in Opposition to Defendant's Motion for Summary Judgment." Local Rule 56.1 requires parties opposing a motion for summary judgment to submit "a separate, *short and concise* statement of the material facts as to which it is contended that there exists a genuine issue to be tried." (Emphasis added). Sheppard's so-called Rule 56.1 Statement, apart from the fact that it ignores the

Rule's requirement that a statement be "short and concise," is problematic for the simple reason that it is not limited to facts as to which it is contended that no genuine triable issue exists, but is instead rife with opinions, legal arguments, and blatant conjectures that clearly are disputed in this litigation. Nonetheless, because Sheppard's Memorandum of Law contains no application of the facts in this litigation to the applicable law identified by Sheppard other than a reference to the Rule 56.1 "Statement", this Court is forced to parse through that "Statement" in an attempt to discern whether Sheppard has demonstrated the existence of a genuine material issue of fact which would render summary judgment inappropriate.

trial motion in a pending murder case, *People v. Mason & Williams*. According to Sheppard, Judge Beerman asked Sheppard to draft a decision on that motion which Sheppard believed would be unfairly prejudicial to Williams and not based on the merits. Sheppard avers that Judge Beerman wanted him to draft the decision without considering the arguments raised by the defendant, whose papers in opposition Sheppard had not yet seen. Upset with this request, Sheppard claims that he said to Judge Beerman: "Well why don't you have the district attorney's office write the decision since you don't even want me to look at the moving papers. You just say to deny it and that they have done a good job." (Sheppard Dep. at 127.) During his deposition Sheppard acknowledged that this comment was sarcastic but claimed that it was meant not as a sign of disrespect for Judge Beerman, but as an expression of "disrespect for what he was doing." (*Id.* at 128.) Sheppard elaborated at his deposition that he felt that Judge Beerman was railroading Williams because of the pressure exerted by the prosecutor, who was allegedly very upset about the lenient sentence Williams had received in a related drug case, and the publicity generated by the case. While Sheppard admits that Judge Beerman never expressed to him or to anyone else his opinion about Williams' guilt or about the ultimate merits of the case, Sheppard avers that Judge Beerman was telling him, in effect: " 'I want this case to go to trial. I want you to dismiss the speedy trial motion, to rule against it without a hearing regardless of the merits.' In light of all of that, I call that railroading." (*Id.* at 143.) Inconsistent

with his belief that Williams was being railroaded was Sheppard's acknowledgment that Judge Beerman never expressed an opinion about the ultimate merits of the Williams case and never expressed an opinion about the guilt or innocence of Williams. Sheppard inferred that Judge Beerman felt that Williams was guilty based upon his (Sheppard's) belief "that he thought [Judge Beerman] probably thought Williams was probably guilty." (*Id.* at 144.) Sheppard felt that Judge Beerman was "going to do his part, based on the pressure he was getting, to do everything he could consistent with what he thought was beyond the bounds of his propriety to help the prosecutor to get a conviction, so that no one could say there was an acquittal." (*Id.* at 144.) Sheppard also believed that Judge Beerman had unfairly accommodated the prosecution's request to schedule the trial after December on the theory that a jury would be less likely to convict during the holiday season.[2] (*Id.* at 365–69.) As it turned out, however, Williams' case was subsequently dismissed by Judge Beerman. (*Id.* at 144–45.)

Judge Beerman's recollection of the discussion on December 6 was not that he had instructed Sheppard to draft a decision in the case, but that he had simply told Sheppard that he wished to proceed with the case without unnecessary delay, as the case had already been pending for several years and as he had already denied a speedy trial motion by Williams once before. Judge Beerman fully expected that he and Sheppard would discuss the case the next day. (Beerman Aff. ¶¶ 7, 8.)

On the morning of December 7, 1990, Sheppard testified that he came to cham-

---

2. Sheppard's allegations concerning the pressure Judge Beerman faced to be tough on crime were framed within what he deemed to be a more general dynamic plaguing the judiciary in New York, namely "that judges here

were doing what they were doing because it was what the public wanted. The public wanted criminal defendants put away by hook or by crook, and the judges were doing that." (Sheppard Dep. at 239.)

bers and informed Judge Beerman that he refused to work on the speedy trial motion in the *Williams* case because of his belief that the defendant was being railroaded by Judge Beerman. (Sheppard Dep. at 150.) According to Sheppard, Judge Beerman disagreed with Sheppard's accusation that he was railroading Williams and maintained "that all that he had told me was that he would prefer it if the motion can be decided quickly, if it could be." (*Id.* at 350.) Notes prepared by Sheppard after this conversation[3] reflect that Judge Beerman told Sheppard that there was no railroading taking place, to which Sheppard responded " 'that he should drop the lies and face the truth.' " (*Id.* at 163 (quoting Dec. 7 Notes).) Sheppard then "told [Judge Beerman] to stop fooling himself and that it was obvious what was going on[,]" by which Sheppard meant the railroading.

At that point, Sheppard recounts that Judge Beerman specifically told him:

**3.** On December 7, following this confrontation, Sheppard prepared a series of notes documenting what had transpired between himself and Judge Beerman, to which repeated reference was made during Sheppard's deposition. (Notes prepared by Sheppard on Dec. 7, 1990, marked for identification as Def.'s Ex. 1 ("Dec. 7, 1990 Notes").) Sheppard revealed in subsequent deposition testimony that he prepared these written notes for two reasons: the first being that he wanted to have some insight as to whether or not Judge Beerman was searching his office and the second being that, assuming Judge Beerman was in fact searching his office, he wanted to suggest that he planned to report this allegation of corruption. (Sheppard Dep. at 247.) Besides containing a recitation of the events that had transpired between himself and Judge Beerman, the notes included the names of members of the Commission of Government Integrity and judges who had been accused of corruption. (*Id.* at 247–49.) Sheppard testified that he hoped that Judge Beerman would not come in to his office at all, but that, in the event he did come in,

"Well, if that's how you feel, then you should look for another job." (Sheppard Dep. at 151.)[4] Sheppard testified, however, that Judge Beerman informed him that he was not being fired. (*Id.* at 177.) In response, Sheppard recalled telling Judge Beerman: "Why should I look for another job? You're the corrupt son of a bitch doing these things, and I am innocent, and I'm just saying I don't want to do it. So why should I have to look for another job?"[5] During his deposition, Sheppard claimed that he was saying to Judge Beerman, in effect: "I will expose you if you fire me." (Sheppard Dep. at 164.) When asked whether Sheppard meant this as a threat, he answered:

No. It was meant to try to, well, just let him know that, in fact, that was going to happen. I also told him that if my only choice was to take part in the misconduct or to look for another job, then I was going to expose him. Also, if he

the notes would serve both to scare Judge Beerman and also allow Sheppard to find out whether Judge Beerman was searching through his office because he likely would mention something he saw in the notes. (*Id.* at 249–50, 265–66.)

**4.** Later in his deposition, Sheppard stated that: "He said, after I had told him that I had taken notes, and some other things were said, then he ultimately said, 'Why didn't you look for a job somewhere else?' You know, 'Why didn't you go back to Legal Aid?' " To which Sheppard testified that he replied: "I said I wanted to work as a law secretary, and I didn't see any reason why I shouldn't continue working there. I wasn't doing anything wrong." (Sheppard Dep. at 161.)

**5.** At another point in his deposition, Sheppard recalled saying: " '[T]his whole thing would blow up if he tried to fire me, since I was not going to be the unemployed one, where he's the corrupt judge and I'm the innocent party.' " (*Id.* at 164 (quoting Dec. 7, 1990 Notes).)

fired me, I was going to expose him. I just let him know these were the options.

(*Id.* at 165.) Sheppard also testified that he was attempting to convey to Judge Beerman: "I'm letting you know full ahead, if you fire me or if you force me to resign, this is going to come out." (*Id.* at 182.) Judge Beerman then told Sheppard that he had misunderstood his intentions with respect to the motion in the *Williams* case, but Sheppard insisted upon his belief that Judge Beerman was treating the defendant in that case unfairly. (Beerman Dep. at 151.)

Sheppard further testified:

Well, after I called him a corrupt son of a bitch, then he said, he got upset, and said, 'We can't have you saying that,' and then I said, 'Look, you're right. I'm sorry I called you a son of a bitch. I shouldn't have said that, but as far as the corruption goes, you know, you are doing these things, you know what you told me about Williams is not what happened, and you know it. You've been doing things in other cases.'

(*Id.* at 152–153.)

At this point, Sheppard avers that Judge Beerman asked him to provide specific examples of what, other than his accusation concerning the *Williams* case, Sheppard felt Judge Beerman had done improperly. (*Id.* at 154.) Judge Beerman too recalls asking Sheppard to explain what he meant in accusing him of being corrupt, and Sheppard answered: "Never mind. You know what." (Beerman Dep. at 223–25, 256–57.) Sheppard recounted:

And I said, you know, 'I've seen you make decisions where you just decide one thing contrary to what you believe, you know. You're doing the thing on the *Babarcich* case, and, you know, you may feel it's okay when you just come out with a decision, saying things, and

no one knows what you're really doing, and you can just say to me, 'I don't believe that police officer,' and then write your opinion you do, and no one knows, and I have sat there and watched it. But for you to say to me that the fight we had yesterday over this never happened,' I said, 'who do you think you're kidding? Just because you're a judge, you can't say the moon is blue, and it's blue.' I said, 'You and I both know what happened yesterday.'

(*Id.* at 152–53.)

The *Babarcich* case, which Judge Beerman was then trying, was a vehicular manslaughter case in which Sheppard also felt that Judge Beerman was improperly succumbing to prosecutorial pressure. Sheppard testified at his deposition that, shortly after Babarcich's arrest, the prosecutor in the case came into chambers by himself with an article about the arrest and told Judge Beerman: "Take a look at this, remember Babarcich, he was just arrested for killing the father of five children in a drunk driving case ... I just want to remind you that this was your case and he's out now on a stay of your sentence" (*Id.* at 156.) After the prosecutor left, Sheppard testified that:

[Judge Beerman] turned to me and said he was very angry, and he said, 'I'm going to revoke his probation. I'm going to violate his probation.' And then I said, 'No, you are not able to do that. You are not going to do that.' And then he said, 'Don't give me any of your— ' these are his exact words—'legalistic arguments. I'm going to do it.' And I said, 'There's no way you can do it. He's not going to be charged with a violation of probation.'

(*Id.* at 156–57.) Sheppard testified that he believed that, after this conversation with the prosecutor, Judge Beerman had tried

to get the vehicular manslaughter case assigned to him so that he could "exact revenge" on Babarcich by obtaining a conviction, since Babarcich already had a criminal case pending before Judge Beerman when he was rearrested. (*Id.* at 153, 155–57, 168.) Babarcich's sentence in that prior criminal case, a low level felony drug case, had been stayed and Babarcich had been arrested in the second case for driving while intoxicated and killing the father of five children. (*Id.* at 156.)

Besides informing Judge Beerman that he felt he had acted improperly in the *Babarcich* case, Sheppard referred, vaguely, to how he remembered other "very serious things" Judge Beerman had done, but he did not offer any other specific instances of misconduct. Sheppard contends that Judge Beerman then asked him how he remembered what had happened in the earlier *Williams* case, because that case had been tried a year earlier. Sheppard replied: "That's not the sort of thing one forgets, and any of the other misconduct." (*Id.* at 351.) Sheppard then informed Judge Beerman that he had kept notes concerning Judge Beerman's misconduct which he would make public if he forced him to resign.[6] (*Id.*) Sheppard also told Judge Beerman: "My mother told me that I'm like the snake on the flag that says 'don't tread on me.'" (*Id.* at 182; Beerman Dep. at 90.)

According to Sheppard, Judge Beerman expressed shock at these accusations and told Sheppard that he was "disturbed" and "disloyal" and asked him what he planned to report. (Sheppard Dep. at 351.) Judge Beerman's recollection of Sheppard's demeanor during this conversation is as follows:

You [Sheppard] were ranting and raving about irrelevant matters and making statements that made no sense, and just continued by telling me I couldn't fire you. I don't know why. You didn't explain why, and that you couldn't take it any more and you couldn't stand and watch what was going on, and I asked you, 'I don't know what you're talking about. What did you ever see? What did you ever hear? What did you ever watch?' You never gave me any responses except repeating over and over again. That's it.

(Beerman Dep. at 218.) Sheppard alleges that, after the confrontation, he offered to go home so that Judge Beerman could think about the situation. However, Judge Beerman instructed Sheppard to remain at work, which he did.

That evening, Judge Beerman conferred with his son, an attorney, and came to the realization that he and Sheppard could no longer work together in view of Sheppard's behavior and its deleterious impact on the working relationship. (Beerman Dep. at 96–97.) Judge Beerman resolved to speak with Administrative Judge Alfred Lerner about the incident when he returned to the courthouse on the following Monday, December 10, 1990.

Sheppard did not appear at work on the Monday following this incident. On that Monday, December 10th, Judge Beerman attempted to reach Judge Lerner, but was told by his secretary that he would not be able to participate in a meeting until the following day. On December 11, 1990, Judge Beerman spoke with Judge Lerner about the incident. Judge Lerner was astonished at Sheppard's behavior and confirmed Judge Beerman's view that Sheppard could no longer remain in either

---

**6.** Because Sheppard only prepared these notes after the conversation on December 7, this statement was false.

Judge Beerman's employ or the employ of the court system. (*Id.* at 378.) Judge Lerner also told Judge Beerman that he could terminate Sheppard for cause or for no reason at all, since Sheppard was not a civil servant. (Lerner Dep. at 34.) At that point, Judge Beerman determined that Sheppard would be discharged. (Beerman Dep. at 386.) Given Sheppard's outburst of a few days earlier, Judge Lerner expressed concern about how Sheppard might react to the news of his termination and suggested that court officers deliver a letter of termination to Sheppard and that he be asked to leave the building immediately. (Lerner Dep. at 17–19, 27–28, 31–34.) Court officers did deliver such a letter to Sheppard when he arrived in chambers on December 11, four days after the December 7 confrontation and the first working day that Sheppard actually appeared at the courthouse.

Several days later, Sheppard was permitted to return to chambers to retrieve his personal belongings, all of which had been placed in a box by Judge Beerman's secretary. Although he cannot provide any evidence of or corroboration for his belief, Sheppard contends that, in the intervening days between his termination and his retrieval of his personal belongings, Judge Beerman searched Sheppard's office and read the notes he had prepared with the intention of scaring Judge Beerman and leading him to believe that he might be "exposed." (Sheppard Dep. at 246–52, 267.)

Both Sheppard and Judge Beerman testified that, prior to this incident, the two had enjoyed a cordial working relationship. (Beerman Dep. at 70.) Judge Beerman was not aware of any complaints Sheppard had lodged either to him or to anyone else about Judge Beerman's allegedly unethical conduct (*Id.* at 590; Beerman Aff. ¶ 11), and Sheppard acknowledged that he had never before made any such complaints (Sheppard Dep. at 114.) Sheppard also acknowledged that he was unaware of anyone else making allegations that Judge Beerman was corrupt, either to Sheppard or to anyone else.

Despite his apparent satisfaction with his job and employer, Sheppard claimed that he eventually became frustrated by the countless acts of judicial misconduct he had witnessed, both on the part of Judge Beerman and other judges in Queens. In 1989, Sheppard decided to contact a reporter for the New York Times to discuss misconduct in the Queens County Supreme Court generally, only to be told that the New York Times would not be interested in reporting on a story concerning Sheppard's observations. Sheppard never approached the New York State Commission on Judicial Conduct (the "Stern Commission") because he felt that the Commission had handled prior investigations into judicial misconduct poorly and would likely by ineffectual in addressing the misconduct allegedly witnessed by Sheppard. After his discharge, Sheppard decided not to "go public" with the accusations because he continued to feel that the Stern Commission lacked independence in its investigations into judicial misconduct, because he feared retribution, and because he believed that his only "refuge" was in the federal courts.

On the basis of these facts, Judge Beerman contends that Sheppard has failed to unearth any evidence whatsoever that he was acting with an improper motive when he terminated Sheppard. To the contrary, Judge Beerman maintains that all of the evidence produced by Sheppard points to the inescapable conclusion that the termination came about because Judge Beerman believed that Sheppard's words and actions on December 7, 1990 had irreparably destroyed their working relationship

and the efficient functioning of his chambers, not because he wanted to prevent Sheppard from exposing his baseless and inexplicable illusion of Judge Beerman's corruption, or for any other improper purpose. Sheppard, on the other hand, maintains that the case must proceed to trial because the events leading up to and following his termination suggest an impermissible motive on Judge Beerman's part to prevent Sheppard from engaging in speech that touched on an important issue of public concern.

## Discussion

### I. The Governing Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions ... together with the affidavits ... show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "moving party is 'entitled to judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a summary judgment motion, a court need not resolve disputed issues of fact, but need only determine whether there is any genuine issue to be tried. *Eastman Mach. Co. v. United States,* 841 F.2d 469, 473 (2d Cir.1988). A disputed fact is material only if it might affect the outcome of the suit under the governing law. A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a reasonable jury could return a verdict in her favor. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248–249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

Summary judgment in cases involving a government employee's assertion of free speech rights is appropriate where the employee has failed to articulate genuine issues of fact as to the actual reason for the employee's discharge. *McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 282 (2d Cir.1999); *Giacalone v. Abrams,* 850 F.2d 79, 88 (2d Cir.1988). In order to establish a *prima facie* case sufficient to avoid summary judgment, a plaintiff "must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on" an illegal motivation. *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997). Summary judgment is appropriate where the inference of improper motivation is based not on reason, but on "mere speculation or conjecture[,]" *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir.1999), *cert. denied,* 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000), or "from thin air[,]" *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998). General attacks on a defendant's credibility or honesty do not by themselves provide sufficient evidence to defeat summary judgment. *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759, (1998).

A plaintiff seeking to establish a *prima facie* case of retaliation for speech protected under the First Amendment must point to evidence sufficient to establish three elements: (i) the plaintiff engaged in constitutionally protected speech; (ii) the plaintiff was subjected to adverse action or was deprived of some benefit; and (iii) the protected speech was a "substantial" or a "motivating factor" in

the adverse action.[7] *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Although "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of public employment[,]" the government may exercise broader power to regulate the speech of its employees than over private citizens. *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Thus, government employees have a limited right under the First Amendment to speak on matters of public concern. *Id.* at 146, 103 S.Ct. 1684; *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir.1993). The government's ability to exercise this broader power is due to the fact that the government's interest in the efficient discharge of public services is substantially more significant when it is acting as an employer rather than as a sovereign:

> The government's interest in achieving its goals as efficiently and effectively as possible is elevated from a relatively subordinate interest to a significant one when it acts as an employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters v. Churchill*, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

To accommodate the competing interests of the government employer and the employee, the Supreme Court has formulated a two-part test for determining whether an employee's speech is protected under the First Amendment. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The issue of whether a plaintiff was engaged in protected speech is a question of law for the court, and the employee bears the burden of proving that his actions were constitutionally protected in the particular circumstances. *See Connick*, 461 U.S. at 148 n. 7 & 150 n. 10, 103 S.Ct. 1684 ("Because of this obligation, [the court] cannot 'avoid making an independent constitutional judgment on the facts of the case.'") (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 190, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Brennan, J.)); *see also Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 629 F.2d 993, 1003 (5th Cir.1980) (the "ultimate balancing of interests of citizen and state with regard to first amendment protection . . . remains in the sphere of the court").

■ The first part of the so-called "Pickering balancing test" requires the court to ask whether the speech at issue addressed a matter of public concern. *See Rankin v. McPherson*, 483 U.S. 378, 385,

---

7. In regard to this element, and bearing in mind that under the Unified Court System in New York, law clerks are personally appointed and serve at the judge's pleasure and that Sheppard understood that "a State Supreme Court Judge has the power to hire and fire at will" (*See infra* at 25–26), it is important to note the following observation: "A rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occu-

pied had he done nothing. The difficulty with [such a] rule . . . is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such employee is placed in no worse position than if he had not engaged in that conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–86, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) ("The threshold question in applying this balancing test is whether [the employee's] speech may be 'fairly characterized as constituting speech on a matter of public concern.'") (citations omitted). Next, the court must weigh the employee's interest in speaking against the government's interest in promoting the efficiency of the services it performs through its employees. *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731; *McCullough,* 187 F.3d at 278–79. With respect to this showing, "the [government]'s burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Frank,* 1 F.3d at 1329 (alteration in original) (quoting *Connick,* 461 U.S. at 150, 103 S.Ct. 1684). Only if an employee can satisfy both parts of this test, thus proving his or her speech was protected, should the court move on to determining whether the last two elements of a cause of action for retaliation—adverse action and motivation—are present.

In *Sheppard II,* the decision vacating this Court's dismissal of the Complaint pursuant to Rule 12(c), the Second Circuit noted that, in weighing the potential disruptiveness of the speech against the employee's interest in engaging in that speech, the court must find not only that the employee's interest in engaging in the speech was outweighed by its potential disruptive impact, but also that the employer took the adverse action *because* of that potential for disruption, and not because the employee threatened to disclose actual or potential wrongdoing:

It is clear, though, that a government official may, in certain circumstances, fire an employee for speaking—even on a matter of public concern—where that speech has the potential to disrupt the work environment. *See Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). In *Jeffries*

*v. Harleston,* 52 F.3d 9 (2d Cir.), *cert. denied,* 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995), we stated that termination does not violate the employee's First Amendment rights where:

(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech.

52 F.3d at 13; *see also Waters v. Churchill,* 511 U.S. 661, 677–81, 114 S.Ct. 1878, 1889–91, 128 L.Ed.2d 686 (1994); *see generally Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 674–76, 116 S.Ct. 2342, 2347–48, 2352, 135 L.Ed.2d 843 (1996). Thus, even if the potential disruption to the office outweighs the value of the speech, the employer may fire the employee only because of the potential disruption, and not because of the speech. That is to say, it matters not that the potential disruption outweighs the value of the speech if the employer subjectively makes the speech the basis of his termination decision: such "retaliatory" discharge is always unconstitutional.

*Sheppard II,* 94 F.3d at 827–28. Because the issue on appeal to the Second Circuit was this Court's dismissal of the Complaint on the grounds that Judge Beerman was entitled to qualified immunity, the panel then turned its attention to that defense, which it described in broad terms as follows:

As with any "constitutional tort," a governmental employer (such as a state court judge) may be entitled to qualified immunity for firing an employee in apparent breach of the First Amendment. *See Tompkins,* 26 F.3d at 607; *Frank,* 1 F.3d at 1327–28. If the employer's fir-

ing of the employee actually violates the employee's *First Amendment* rights, the employer will nonetheless be qualifiedly immune from suit if an objective, reasonable officer could believe that the firing did not violate the employee's rights. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Frank,* 1 F.3d at 1327–28.

*Sheppard II,* 94 F.3d at 827–28. Having set out this standard, the panel went on to note that there existed a potential tension between the constitutional test for a First Amendment violation—which contemplates inquiry into the subjective state of mind of the employer—and the qualified immunity test—which is focused on the reasonable belief of an objective employer:

> This case presents the risk of conflating a constitutional test that focuses, at least in part, on the subjective state of mind of the actor—the employer's actual motive for firing the employee—with the objective focus of the qualified immunity doctrine. Obviously, applying an objective test to a subjective element is a contradiction in terms: it would compel an inquiry as to whether a person reasonably could have thought that he in fact thought something.

*Id.* at 828. Moreover, the panel found that by dismissing the Complaint on the grounds that an objective judge reasonably could have thought that the potential for disruption caused by the speech outweighed the value of that speech, this Court improperly had held that Judge Beerman's actual motivation was irrelevant, effectively denying Sheppard the opportunity to adduce evidence of unconstitutional motive. Instead of subjective intent simply dropping out, the panel stated that the subjective state of mind of the employ-

er is not irrelevant to the qualified immunity inquiry:

> Contrary to the district court's decision, the employer's actual (subjective) motive is not irrelevant in a qualified immunity inquiry. Rather, where the subjective state of mind of the actor is part of the constitutional mix, we have developed a rule that balances the interests of the official claiming immunity against the interests of the employee asserting unconstitutional motive:
>
>> Upon a motion for summary judgment asserting a qualified immunity defense in an action in which an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts ... supporting the claim of an improper motive in order to avoid summary judgment.

*Blue v. Koren,* 72 F.3d 1075, 1084 (2d Cir.1995).[8] This standard allows an allegedly offending official sufficient protection against baseless and unsubstantiated claims, but stops short of insulating an official whose objectively reasonable acts are besmirched by a prohibited unconstitutional motive. *See Tompkins,* 26 F.3d at 607–08.

Thus, to defeat Beerman's claim of qualified immunity, Sheppard must show "particularized evidence of direct or circumstantial facts" supporting his claim of unconstitutional motive.

*Id.* at 828. The panel further noted that, in view of a Complaint that alleged that Judge Beerman had expressed deep concern over Sheppard's claim to have kept notes detailing his corruption and the possibility that those notes would be made

---

**8.** *Blue* was decided six days after this Court issued its decision dismissing Sheppard's

Complaint on the basis of qualified immunity.

public, this Court's dismissal prior to discovery deprived Sheppard of the chance to prove that these allegations were true, and that Judge Beerman's decision to terminate Sheppard was motivated by an impermissible desire to suppress protected speech.

> If substantiated through discovery, these facts may tend to show that Beerman's actual motive for firing Sheppard was the content of his speech, and not Beerman's fear that Sheppard would disrupt the office working environment. . . .

> The district court therefore erred in finding that Beerman's actual intent was "irrelevant," and in not allowing Sheppard discovery to support his claim of unconstitutional motive. If, after sufficient discovery, Sheppard cannot present particularized (direct or circumstantial) evidence of unconstitutional motive, Beerman is then, but only then, entitled to summary judgment on the grounds of qualified immunity.

*Id.* at 829. Accordingly, the Second Circuit instructed that the Complaint could not be dismissed as a matter of law on the basis of qualified immunity even where a belief on the part of Judge Beerman that the speech in question would cause a disruption that outweighs the value of that speech was objectively reasonable. Rather, the court held that Sheppard had a right to conduct discovery on the subjective motive of his employer and to substantiate his claim of unconstitutional motive with particularized evidence.

In this motion, Judge Beerman argues that summary judgment must be entered against Sheppard both because he has failed to demonstrate any genuine factual issues which would support his *prima facie* case of a First Amendment violation and because, even if he could do so, Judge Beerman would be entitled to qualified immunity because Sheppard has failed to elicit any evidence, particularized or circumstantial, of an improper subjective motivation on Judge Beerman's part.

## II. Judge Beerman's Motion for Summary Judgment

In this case, the record is clear that Judge Beerman took adverse action against Sheppard by terminating him and that Judge Beerman's actions were motivated entirely by Sheppard's outburst on December 7. The deciding issue, therefore, is whether Sheppard's speech was protected by the First Amendment. Whether Sheppard's speech was protected turns first on whether it touched on matters of public concern and, second, on whether Judge Beerman's interest in the efficient operation of chambers outweighed Sheppard's interest in commenting on and exposing his questionable opinions regarding Judge Beerman's alleged corruption.

In a prior opinion, this Court found that Sheppard's speech touched upon a matter of public concern, 911 F.Supp. at 611 and now turns to consider whether Sheppard's interest in commenting upon such matters is outweighed by Judge Beerman's interest in maintaining the efficient operation of his Chambers.

## A. Was Sheppard's interest in engaging in speech on a matter of public concern outweighed by Judge Beerman's interest in maintaining effective workplace?

In considering whether or not Sheppard's interest in engaging in the speech at issue was outweighed by Judge Beerman's interest in ensuring the smooth functioning of his chambers, a great deal of deference is owed to Judge Beerman's decision in this matter. *See Connick,* 461 U.S. at 151–52, 103 S.Ct. 1684 ("When close working relationships are essential to

fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate."); *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir.1998) (granting summary judgment against plaintiff police officer whose interest in speaking on matter of public concern did not outweigh department's right to punish him for his insubordination and holding that "[s]ubstantial weight is accorded the government employer's [reasonable] prediction that given speech has the potential for disruptiveness"). The *Rankin* Court stated:

> In weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.

*Rankin*, 483 U.S. at 390–91, 107 S.Ct. 2891. The *Rankin* Court quoted *Connick v. Myers*, 461 U.S. at 147, 103 S.Ct. 1684, as follows: "absent the most unusual circumstances a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Rankin*, 483 U.S. at 384 n. 7, 107 S.Ct. 2891. "The more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir.1997) (quoting Craig D. Singer, Comment, Conduct and Belief: Public Employees' First Amendment Rights to Free Expression and Political Association, 59 U.Chi.L.Rev. 897, 901 (1992), and citing *Caruso v. De Luca*, 81 F.3d 666, 670 n. 3 (7th Cir.1996); and *Hall v. Ford*, 856 F.2d

255, 261–64 (D.C.Cir.1988)). Thus, the nature of the employee's position is critically important in the free speech balancing test. *McEvoy*, 124 F.3d at 103. ("Indeed, where the employee holds an extremely confidential or highly placed advisory position, it would be unlikely if the Pickering balance were to be struck in his favor. The tremendous disruption to the public workplace likely to result from the critical speech of such an employee would in most cases outweigh any First Amendment interests possessed by that employee.")

That Sheppard both occupied and saw himself as occupying a position of confidentiality is beyond dispute. A law clerk "is probably the one participant in the judicial process whose duties and responsibilities are most intimately connected with the judge's own exercise of the judicial function." *Oliva v. Heller*, 839 F.2d 37, 40 (2d Cir.1988). Under New York State's Unified Court System, law clerks are personally appointed and serve at the judge's pleasure. Because a law clerk often is privy to a judge's thoughts and decision-making processes, the "importance of a cooperative and confidential relationship with staff members" cannot be overemphasized and the absence thereof "is disruptive and inevitably impairs the operation of any court." *McDaniel v. Woodard*, 886 F.2d 311, 316 (11th Cir.1989) (quoting *Abbott v. Thetford*, 529 F.2d 695, 705 (5th Cir.1976) (Gewin, J., dissenting), *rev'd. on rehearing en banc*, 534 F.2d 1101).

During his deposition, Sheppard demonstrated a full understanding of the importance of an effective and mutually trusting working relationship between a judge and his law clerk. Although Sheppard could not recall precisely whether Judge Beerman had explained to him that it was important for a judge and his clerk to have a relationship of mutual confidence and respect, he "imagined" that Judge Beer-

man had done so. (Sheppard Dep. at 64.) Sheppard stated that he "absolutely" understood that a judge needed to rely on his law secretary to maintain the confidentiality of what took place in chambers and needed to have trust in his law secretary, both in his legal ability and in his ability to get along with the judge. (*Id.* at 65) When asked if he had "any opinion about whether[,] if a judge perceived that his law secretary did not have confidence in him or her[,] that might be problematic for the judge?", Sheppard responded: "Yes, I think that would be problematic for the judge." (*Id.* at 66.) Sheppard acknowledged, moreover, that a judge "certainly" would be justified in seeking a new secretary if the judge thought that he did not have the confidence of his current secretary and that:

> under the law, except for certain limitations, a state Supreme Court judge has the power to hire and fire at will, but—so if you're asking me—so they can just do it, and I think the law recognizes that. But I think it's a good thing that a judge has the ability to hire and fire someone in that position if the judge doesn't—if the judge wants to feel comfortable and doesn't. The judge loses trust. For any of things, I think a judge should be able to fire the law clerk, you know, provided that none of the other legal rules are disobeyed.

(*Id.*) When asked whether a judge would have a legitimate basis for terminating a law clerk who yelled at the judge or who told the judge that he was a nasty person, Sheppard could not clearly answer the question.

A careful reading of Sheppard's deposition, which extended over a period of three days and 655 pages of transcript (to which he appended 42 pages of errata sheets) reveals not a jot or tittle of particularized evidence, direct or circumstantial, of a motive to discharge Sheppard other than his insubordination and a concern for the maintenance of an efficient and effective Chambers. In that regard, a sampling of Sheppard's own deposition testimony is revealing:

Q. Do you understand the term "insubordination?"

A. It's sort of a loose term that I have a gist of, but I think I even looked it up, and it has different meaning and connotations, and I think it's sort of used loosely. So I have a general idea, but I have often felt that it's not exactly clear what it means.

For example, I think one of the definitions I saw was someone who is insubordinate is someone who doesn't follow authority.... And then for example, the unemployment people told me that cursing at one's employer and then having an emotional outburst in front of the employer, that for their purposes of determining unemployment, that is insubordination.

Q. Do you consider cursing at your employer an act of insubordination?

A. Again, it depends what you mean. They have their own purposes, and what one means by insubordination, if it basically—*I was even being insubordinate before that, if its being rebellious against authority or rejecting authority. I was expressing that when I simply said, "I won't work on this motion."* (Emphasis added).

(*Id.* at 204–05 and Errata p. 15.)

\* \* \* \* \* \*

Q. After you accused the judge of being corrupt and calling him a son of a bitch, do you think it's fair to assume that he lost confidence in you?

A. Well, it depends what you mean by "confidence." I think he probably lost

confidence as soon as I told him I wasn't going to work on the Williams case.

Q. You said earlier that it's important for a judge to have confidence in his law secretary, correct?

A. Yes.

Q. And if the judge loses confidence in his secretary, it can undermine an effective working relationship?

A. Absolutely. . . .

(*Id.* at 180.)

As for his own conduct, Sheppard was asked whether, in the days following the incident, he felt embarrassed or that he might have overstepped his boundaries, to which he replied: "Not at all." (*Id.* at 192.)

That a judge who loses the confidence and trust in his law clerk is justified in terminating that law clerk's employment is not at issue here, as Sheppard does not question that principle. Instead, the only question that remains is whether Judge Beerman's decision to terminate Sheppard was motivated by his belief that Sheppard's actions had destroyed their working relationship or, by a desire to prevent Sheppard from engaging in the speech and advancing his accusations of misconduct. Because all of the evidence before the court, which is discussed in greater detail below, leads to the undisputable conclusion that Judge Beerman was motivated by a desire to maintain harmony in the workplace and, to preserve the efficiency and effectiveness of his Chambers, and not by a desire to suppress Sheppard's speech, summary judgment must be granted as against Sheppard.

Despite his claim of improper motive, Sheppard's deposition reeks with evidence that simply could not be interpreted by a reasonable fact-finder to suggest an improper motive, and, in fact, clearly establishes that Judge Beerman was mo-tivated by a desire to ensure the smooth functioning of his chambers. First is Sheppard's own admission that he was insubordinate when he expressed an unwillingness to perform the work Judge Beerman had asked him to perform. During his deposition, Sheppard acknowledged that on December 7, 1990, the day of his confrontation with Judge Beerman, he explicitly refused to draft an order in the manner Judge Beerman had directed him to. (*Id.* at 150–151.) A more direct form of disruption to the workplace can hardly be imagined.

Next, despite Sheppard's contention that Judge Beerman was acting with the unconstitutional desire to prevent him from bringing to light his accusations of misconduct, Sheppard's own account of the events that transpired on the day of the confrontation compel the conclusion that Judge Beerman did not prevent Sheppard from taking action on his threats of exposure. Sheppard testified that Judge Beerman told him that he should consider looking for another job if he felt that he had improperly handled the *Williams* speedy trial motion. At that point, Sheppard stated that Judge Beerman was "the corrupt son of a bitch doing these things" (*Id.* at 161), and that "this whole thing would blow up if he tried to fire me, since I was not going to be the unemployed one, where he's the corrupt judge and I'm the innocent party" (*id.* at 164 (quoting Dec. 7, 1990 Notes)). That Judge Beerman proceeded to fire Sheppard under any reasonable interpretation of the facts, compels the conclusion that Judge Beerman invited Sheppard to take action on his threats and reveal his allegations of corruption. Sheppard's acknowledgment that Judge Beerman discharged him after he threatened to "go public" with the allegations of corruption if discharged itself belies the existence of an intent on Judge Beerman's part to silence Sheppard, since it would be reason-

able to infer that Judge Beerman would not have fired Sheppard if he actually feared exposure. Stated another way, Sheppard's contention that Judge Beerman was motivated by a desire to suppress speech concerning matters of public concern is *disproved*, rather than proved, by the act of termination, since that act, as described by Sheppard, was akin to an invitation to speak.

The third factor pointing to a lack of improper motivation is the absence of any suggestion in the record, either before or after the termination, that Sheppard was ever prevented from engaging in speech critical of Judge Beerman—from which an improper motive on Judge Beerman's part might be inferred. When asked whether Judge Beerman had ever prevented him from revealing his allegations of judicial misconduct to the press, the Stern Commission or any other governmental body, Sheppard acknowledged that neither Judge Beerman nor anyone else had ever done so. (*Id.* at 579.) Even when Sheppard confronted Judge Beerman with his accusations of wrongdoing and informed him, falsely, that he had maintained notes on his desk blotter detailing this wrongdoing, Judge Beerman never attempted to induce Sheppard not to reveal his accusations or share his notes with anyone. Nor is there any evidence in the record, other than pure speculation on Sheppard's part, that Judge Beerman ever searched for those notes or otherwise became aware that Sheppard was amassing evidence of his alleged wrongdoing. In fact, it is plain from the record that Sheppard was never prevented from speaking but, rather, that the reason he did not engage the public in his accusations of impropriety was that he was concerned about possible negative repercussions to himself.

Nor can Sheppard offer any evidence that Judge Beerman attempted to stop Sheppard from approaching the press or someone within the courts with his allegations. In fact, Sheppard freely acknowledged that he chose not go to anyone within the courts with his concerns and also that he was never prevented from doing so. Sheppard went to great lengths during his deposition to explain why he failed to take any efforts to "expose" Judge Beerman. The reasons he cited were threefold: (i) the lukewarm reaction of the press during his initial communications with reporters; (ii) his belief that corruption was so deep-seated that no one would ever do anything about it, other than punish him; and (iii) his lack of trust in the officials charged with investigating corruption. Interestingly, none of the reasons Sheppard cites involve any effort by Judge Beerman to silence him. Sheppard maintained, for example, that once his concerns surfaced, he did not approach anyone because: "First, before I would go to anyone, I wanted to seek how widespread this was." (*Id.* at 86.) While Sheppard acknowledged that he was not trained as an investigator, he felt that other people were not better suited to determine the scope of alleged corruption because he was "on the inside" and therefore had a "better ability to do that." (*Id.* at 87.) Sheppard acknowledged, moreover, that he never researched whether he had a duty to report his perceptions of corruption, but chose to focus first on whether there was someone to whom he could have reported those perceptions.

Other portions of Sheppard's deposition reveal someone who was aware of several possible entities he could have approached with his accusations of judicial misconduct, but simply chose never to do so. Sheppard admitted that he was aware of an office within the state government known as the Commission on Judicial Conduct (*id.* at 88–89)—also known as the Stern Commission after its head, Gerald Stern—

which had been formed to field complaints about corruption. However, Sheppard testified that he "wasn't really sure what the [Stern Commission's] mission is" and that he never contacted it about Judge Beerman. (*Id.* at 89.) When asked why he did not contact the Stern Commission, Sheppard cited "a bunch of reasons." Foremost, Sheppard testified—with an ironic degree of expertise and familiarity, despite his professed ignorance of the Stern Commission's purpose—that the Commission "had a reputation for or [has] been largely criticized for going after sort of small fish, villages, small upstate villages and not really doing anything about judges who were higher up[.]" (*Id.* at 90.) Sheppard also testified that over time he read reports by the Stern Commission and concluded that its members could not be trusted to carry out the disciplinary measures needed to address the misconduct he felt was being perpetuated by the Bench in Queens County.

> [D]espite what was obvious to me, that at least in Queens misconduct was rampant[,] Judges, Supreme Court Judges basically never get, at least publicly, disciplined or barely disciplined at all by them, and when they do, it never has anything to [do] with the sort of things I was seeing and, you know, one seriously has to wonder. Obviously this is going on, and either no one is complaining, which has to make you wonder if this is going on, and so many people know and no one else is complaining, why aren't they complaining, and are they complaining and nothing is being done about it. That was [an] additional concern. Then I read about the Murphy case, which made me and a lot of other people

have serious questions about the Commission on Judicial Conduct.[9]

(*Id.*) Sheppard also revealed that he feared the negative repercussions to himself if he were to approach the Stern Commission with his allegations of misconduct on the part of Judge Beerman. When asked whether it was his belief that one of the reasons that he did not report the perceived misconduct of Judge Beerman was that essentially nobody would care, he replied: "Yes. Or care in a sense of actually doing something about it, other than having me get hurt. Yes." (*Id.* at 91.) In essence, it is perfectly clear from the record that Sheppard was in no way prevented from approaching the Stern Commission for any reason other than his own belief that complaining to the Stern Commission would create problems for himself. In a lengthy Errata Sheet he subsequently prepared, Sheppard elaborated on the reasons that he decided not to approach the Stern Commission, stating that he feared the possibility that he himself might be disciplined if his complaints were determined by the Stern Commission to be unfounded. (Sept. 25, 1998 Errata Sheet at pp. 2–9, attached as Ex. B to Def.'s Notice of Motion.)

Besides the Stern Commission, Sheppard also testified that he was aware of a commission that had been formed specifically to investigate allegations of corruption in Queens County. According to Sheppard, that commission, known as the Commission of Government Integrity, was headed initially by Joseph Califano, and eventually by John Feerick, the highly respected Dean of Fordham Law School. Sheppard testified that, in the Fall of 1987, two staff members from the Commission of

---

**9.** Sheppard testified at another point in his deposition that Murphy was a case in which two court employees were fired after they sent an anonymous letter to a high-ranking court employee in which they reported misconduct on the part of Judge Murphy. (Sheppard Dep. at 223.)

Government Integrity came to interview Judge Beerman in his chambers. Sheppard had heard of the Commission and knew that they were investigating corruption and improprieties throughout state government. However, Sheppard never attempted to contact the Commission of Government Integrity about his concerns (Sheppard Dep. at 216), reasoning that "word could have gotten back to Judge Beerman and that I would just get fired, and nothing else would happen" (*id.* at 222). Nor did Sheppard consider writing an anonymous letter, as he didn't "know what good that would do" (*id.*), and because he feared the potentially harmful consequences of even an anonymous complaint.[10] (*Id.* at 222–23.)

As for other possible avenues of recourse, Sheppard testified at his deposition that he chose not to approach the press because he "found out in 1989 that it seemed the press wasn't interested either." (*Id.* at 92.) That year, Sheppard called a legal reporter at the New York Times with whom he had attended Stanford Law School and with whom he shared a mutual friend. Sheppard testified that he told the reporter "that I was a law clerk, that there were things going on in Queens that were wrong and that I thought the Times might be interested in it." (*Id.* at 95.) Eventually, Sheppard met with the reporter, but Sheppard had decided not to reveal his specific allegations against Judge Beerman, because he felt that Judge Beerman was "one of the fairer judges" in Queens who didn't engage in "some of the more egregious misconduct." [11] (*Id.* at 96.) Instead, Sheppard spoke in general terms about the alleged misconduct of the Queens judiciary and recalled making the following comments to the reporter:

to talk about what happened, I'd have to include Judge Beerman. I usually tried to make it as nice as I could, because I felt uncomfortable. I mean, again, here I was in a situation where I seemed in a lawless world where what is supposed to be was not so. I didn't know what to do, and as I said, in the scheme of things, Judge Beerman seemed fairer and to follow things better than many of the judges. Whether it was most, I really didn't know. But from some of the other things I was hearing, he just seemed fairer and better, and it just seemed kind of unfair for me to be sitting there taking down everything he did, and plus he was doing too much anyway.

(Sheppard Dep. at 109.) Later in his deposition, Sheppard explained that although he felt that the environment he worked in was corrupt, he decided not to leave his job in part because of his ambivalence about Judge Beerman. "It was—I was, you know, got along well with Judge Beerman ...: And it also seemed to me there was a lot of justice going on. Judge Beerman was a hard working judge in the, you know, in the, in most of the cases. You know, he was fair. He gave fair trials in almost all the cases. A lot of good things were being done. He listened to my advice very often." (*Id.* at 111.)

---

**10.** This concern for the consequences to himself may prompt the question as to whether he was speaking as a citizen at all upon a matter of public concern rather than for himself as a self-appointed avenger of imagined corruption of the entire Supreme Court of Queens County about which no other responsible person did or would care. Whether speech touches upon a matter of public concern must be decided by the content and context in which the statement is made. In making that determination, the Court may consider the attempt made by the employee to make his concerns public along with the motivation for his speech. *See Connick*, 461 U.S. at 138, 147–148, 103 S.Ct. 1684; *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir.1993); *Pappas v. Giuliani*, 118 F.Supp.2d 433, 443 (S.D.N.Y. 2000).

**11.** Sheppard reiterated this assessment of Judge Beerman several times during his deposition, stating once that he did not take detailed notes about all of the allegations of misconduct because he felt uncomfortable:

I tried to avoid taking notes about something Judge Beerman did wrong, if it was just him. There were times where someone else did something, and in a way, in order

I see in Queens all sorts of wrong things that are being done from behind the scenes, and they're basically clearly violating the rights of criminal defendants, and then he ultimately said, well, it sounds like a really big thing, you know, maybe it needs a book and not an article. He said, I don't think they will be interested because the Times is more concerned with national and international news, and they don't really care about what goes on in the city. And then he also said, and besides, I don't think the public will really care if judges are doing things to violate the rights of criminal [defendants].

(*Id.* at 96.) Thus, it is plain that prior to his discharge, Sheppard decided not to air his allegations concerning Judge Beerman to the New York Times, not because Judge Beerman or anyone else prevented Sheppard from approaching the press, but rather because, based on his prior discussions with the newspaper about corruption allegations concerning the Queens judiciary generally, it became clear to him that the newspaper was not interested in publish-

ing those allegations. Again, nothing in Sheppard's deposition even remotely suggests that Sheppard was prevented from sharing his perceptions of misconduct with this or any reporter.[12] Even assuming that all of Sheppard's characterizations of these government commissions are true—that is, that judicial corruption was so endemic that it was tolerated by the very body charged with its investigation and condemnation—and further assuming that the public would not be interested in his claims, there is no reason to believe that Judge Beerman would have feared Sheppard's exposing him. By Sheppard's own calculations, Judge Beerman—and all the other judges on the Queens bench for that matter—could rest assured that Sheppard's allegations, even if true, would never be taken seriously.

Of considerable significance is the fact that Sheppard was addressing Judge Beerman directly and vulgarly when calling him a "corrupt son of a bitch." In this regard, the decision of the Supreme Court in the seminal case of *Pickering v. Board*

---

12. Also clear from the record is the fact that Sheppard was not inhibited from speaking after his termination on December 10, 1990. After his termination, Sheppard never reported Judge Beerman's alleged misconduct to the Stern Commission. At his deposition, Sheppard elaborated on the reasons why he neglected to report the alleged misconduct to the Stern Commission: first was the "Stern Commission's reputation for not dealing with this sort of thing, plus my looking at the Stern Commission reports, which sort of corroborated that, they basically never did anything with Supreme Court judges, and certainly nothing along the lines that I was concerned about. And basically, they seemed never to do any—basically, with all this going on, it seemed no one ever reported what was going on in Queens to them." (Sheppard Dep. at 104.) Sheppard did, however, come close to reporting his allegations of misconduct to the press following his termination. During his deposition, Sheppard testified that he spoke with another reporter from the New York

Times after his discharge and that an attorney who was briefly representing him in connection with the discharge contacted a third New York Times reporter after filing the complaint in this action about the possibility of the New York Times running a story on the discharge. Ultimately, however, it was Sheppard's decision "that I didn't want to have this published in the press immediately, that I first wanted to look at the legal issues involved and what legal ramifications that would have, and also what other choices I had." (*Id.* at 104.) In an Errata Sheet, Sheppard adds that, shortly after his termination, he contacted two reporters at New York Newsday and that, in 1994, shortly after the Second Circuit's decision reversing this Court's dismissal of the complaint, he contacted the New York Times, the ABA Journal, the National Law Journal, the Village Voice, New York Newsday, USA Today, the Washington Post, and American Lawyer. (Sept. 25, 1998 Errata Sheet at p. 9.)

*of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), may be regarded as dispositive. In that case, Marvin Pickering, a high school teacher, was fired by the Board of Education for sending a letter to a local newspaper criticizing the way the Board and the district superintendent of schools handled proposals to raise new school revenues. He claimed that he was fired because he was exercising a right protected by the First Amendment in writing his letter to the newspaper. The Supreme Court of Illinois was reversed insofar as its opinion suggested "that teachers may be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the schools in which they work...." The Court then went on to write what has ever since been a firmly established principle that "the problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. 1731.

Exquisitely applicable to this case is the following declaration by the Court:

An examination of the statements in appellant's letter objected to by the Board reveals that they, like the letter as a whole, consist essentially of criticism of the Board's allocation of school funds ..., and of both the Board's and the superintendent's methods of informing, or preventing the informing of, ... the real reasons why additional tax revenues are being sought for the schools. *The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. There is no question of maintaining either discipline by immediate superi-*

*ors or harmony among co-workers presented here.* Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent, are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. Accordingly, to the extent that the Board's position here can be taken to suggest that even comments on matters of public concern that are substantially correct ... may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it.

*Id.* at 569–70, 88 S.Ct. 1731 (Emphasis added).

The footnote dropped by the Court at that point was also very prescient. In it, the Court wrote:

It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases.

*Id.* at 570 n. 3, 88 S.Ct. 1731.

Some years later, in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619

(1979), the Court commented on its decision in *Pickering* as follows:

> The *Pickering* Court's decision upholding a teacher's First Amendment Claim was influenced by the fact that the teacher's public statements had not adversely affected his working relationship with the objects of his criticism.

> \*   \*   \*   \*   \*   \*

> Although the First Amendment's protection of government employees extends to private as well as public expression, striking the *Pickering* balance in each context may involve different considerations. When a teacher speaks publicly, it is generally the *content* of his statements that must be assessed to determine whether they "in any way either impeded the teacher's proper performance of his daily duties in the classroom or ... interfered with the regular operation of the schools generally." [391 U.S.] at 572–573, 88 S.Ct. at 1737. Private expression, however, may in some situations bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time and place in which it is delivered.

*Id.* at 415 nn. 3–4, 99 S.Ct. 693.

The precise applicability of those observations which are persuasively dispositive of this case are self-evident. Sheppard's statements were directed towards Judge Beerman in a manner that can only be characterized as personally confrontational, and which did more than threaten the institutional efficiency of Judge Beerman's Chambers; it made the continued maintenance of discipline and harmony in his Chambers impossible to contemplate. It is difficult to imagine a rule that would require a judge to retain a law clerk whose abrasive, insubordinate and vulgarly disrespectful conduct towards him condemns his Chambers to a state of interpersonal and professional paralysis even if, in addition to firing him because of it, that conduct may have also inevitably been on his mind. *See, e.g., Doyle,* 429 U.S. at 285, 97 S.Ct. 568.

Sheppard's attempt to support his claim that Judge Beerman was improperly motivated in terminating him by references to Judge Beerman's conduct before, during and after his termination is hopelessly futile. A meticulous review of the deposition testimony fails to disclose a scintilla of evidence to support that claim.

## III. Cross–Motion

In his Cross–Motion to Strike, Sheppard challenges various statements or exhibits contained in Judge Beerman's submissions in support of his motion for summary judgment. Although Sheppard rejects Judge Beerman's suggestion that he is advancing a *per se* challenge to Judge Beerman's deposition testimony, Sheppard cannot seriously characterize his challenge to the testimony and affidavits offered by Judge Beerman as anything but sweeping.

As a general principle, it should be noted that Judge Beerman's reference to depositions and affidavits not only is appropriate, but explicitly contemplated by the Federal Rule of Civil Procedure. Rule 56(c) provides that summary judgment is appropriate "if the pleadings, *depositions,* answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added). The rule plainly contemplates that the parties may rely on deposition testimo-

ny and is not limited to the deposition testimony of the parties. Rule 56(e), in turn, provides that "supporting and opposing *affidavits* shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated herein." Fed.R.Civ.P. 56(e) (emphasis added). Plaintiff's broad challenge is particularly strange in light of his own heavy reliance on deposition testimony, and the testimony of others, in his submissions in opposition to the summary judgment motion, including hearsay and opinion evidence. Sheppard's far-reaching challenge to unspecified material in the affidavits and depositions must therefore be rejected as meritless.

Sheppard next argues that various statements contained in Judge Beerman's Rule 56.1 Statement must be stricken because they contain hearsay and opinion testimony. These statements include: (i) Judge Beerman's descriptions of the *Williams* and *Babarcich* cases (Rule 56.1 Statement ¶ 8); (ii) Judge Beerman's statement that he told Sheppard: "Well, if that's how you feel, then you should look for another job." (*id.* ¶ 15); (iii) Judge Beerman's statement that prior to the December 7, 1990 incident, neither Sheppard (nor anyone else) had ever objected to anything that Judge Beerman had done (*id.* ¶ 35); (iv) Judge Beerman's reliance on Sheppard's own testimony that he was not aware of anyone making allegations or findings that Judge Beerman was corrupt and that nobody ever told Sheppard that they felt Judge Beerman was corrupt or had acted improperly (*id.* ¶¶ 38–39); (v) Judge Beerman's description of the reasons why he spoke to his son after the December 7 confrontation (*id.* ¶¶ 40, 43); (vi) Judge Beerman's statement that his son, Alan Beerman, recommended that Judge Beerman speak with the Administrative Judge,

Judge Lerner (*id.* ¶ 41), a statement which is repeated in any event in Alan Beerman's deposition (A. Beerman Dep. at 44); (vii) portions of Alan Beerman's deposition testimony which arguably contain impermissible opinion testimony (*id.* ¶ 42); and (viii) Judge Lerner's statement to Judge Beerman that Sheppard was an at-will employee (*id.* ¶ 52).

With one exception, this Court need not consider the statements contained in the Rule 56.1 Statement in order to determine that summary judgment is appropriate. With respect to the fourth statement, the Court finds that this statement simply summarizes Sheppard's testimony during his deposition that he was not aware of anyone making allegations or findings that Judge Beerman was corrupt and therefore is an admission against interest. In addition, the statement is based on personal knowledge and is not being offered to prove Judge Beerman's character. Rather, it is being offered to support Judge Beerman's position, and the position apparently acknowledged in this statement by Sheppard, that there was nothing in Judge Beerman's background that would have led him to fear "exposure" after Sheppard accused him of corruption.

Sheppard finally maintains that certain statements contained in the affidavit of Joanne Blais, who worked as Judge Beerman's secretary at the time Sheppard was discharged, must be stricken because they consist of impermissible opinion testimony and hearsay. Because this Court did not need to consider the challenged statements—in which Blais states (i) that she heard Sheppard mention "something about Nazi Germany" (Blais Aff. ¶ 4); (ii) that Judge Beerman told her that Sheppard had called him a corrupt son of a bitch (*id.* at ¶ 9); and (iii) that Judge Beerman appeared to be very upset about the incident with Sheppard (*id.* at ¶ 10)—in deciding

the motion for summary judgment, Sheppard's challenges to those statements need not be addressed here.

Having determined that summary judgment is warranted without reference to the affidavits, testimony or documents which Sheppard alleges may not be considered by the court in his Cross–Motion to Strike, the court need not reach the merits of Sheppard's Cross–Motion to Strike, and therefore it is denied.

## Conclusion

For the foregoing reasons, Sheppard has failed to adduce and evidence, direct or circumstantial of improper motive which precludes the defendant's motion for summary judgment on his First Amendment free speech claim. On the record presented, no reasonable juror could infer from the facts alleged by Sheppard that the termination resulted from an unlawful desire to curb speech on a matter of public concern rather than a legitimate desire by Judge Beerman to maintain the efficiency, discipline and harmony of his public office. Accordingly, summary judgment is hereby directed to be entered as against Sheppard and the case is dismissed in its entirety.

SO ORDERED.